STATE OF MISSOURI, *ex rel.* LEWIS B. BEACH, Circuit Attorney, Appellant, *v.* HENRY L. SUTTON *et al.*, Respondents.

March 5, 1877.

UPON THE DEMURRER.

1. Sections 20 and 21 of article 9 of the Constitution of Missouri of 1875 construed, and their effect declared.

2. In a proceeding by *quo warranto*, the object of which was, by ascertaining whether the respondents were legally appointed judges of the County Court of the new county of St. Louis, to ascertain whether the Scheme and Charter provided for by these sections were ratified by a majority of legal voters voting at the election of August 22, 1876, provided for in section 20, and were thus made the organic law of the county and city of St. Louis, *held,* that section 21 is evidentiary, and intended to mark, officially, the result of the election; that the certificate, when filed, was merely *prima-facie* evidence of the facts required by section 21 to be stated in it; and that the relator could go behind the certificate into the facts.

3. Where the information alleged that a majority of lawful votes cast at the

Scheme and Charter election were cast against the Scheme and Charter, which were thereby defeated, and failed to become the organic law, *held*, on demurrer, that this averment was sufficient without allegations as to particular fraudulent or illegal voters or votes; *held*, further, that the sections of the election law (Wag. Stat. 573, sec. 52 *et seq.*) do not apply to this case; that the mayor and presiding justice of the County Court were the proper canvassing officers for the Scheme and Charter election.

4. Where the information averred that S. had no authority to act as presiding justice of the County Court in making the certificate, but where it also appeared from the information that the result of the Scheme and Charter election was universally accepted as a defeat of the Scheme and Charter, and that, at an election held, under the general belief in such defeat and in the consequent continuance of the office of presiding justice, S. was so elected, and held the office, and, while recognized as such officer, made the certificate, *held*, this gave color of title to his acts as a *de-facto* officer, and that he was the proper officer to make the certificate.

5. The failure to file the certificate within the sixty days named in section 20 was immaterial.

### UPON THE MOTION TO STRIKE OUT.

On motion to strike out parts of the return or answer, *held*, the question for this court in this proceeding was, not whether the mayor and presiding justice acted properly in making and filing the certificate, but whether the Scheme and Charter was ratified by a majority of legal voters voting at the election; and that the certificate operated merely to shift the burden of proof.

### UPON THE INFORMATION.

1. Where the Constitution requires that the mayor of the city and the presiding justice of the County Court shall certify the result of an election, their certificate is *prima-facie* evidence of the result. But the certificates of the judges of election are not sufficient to rebut it, unless supported by the ballots, or by other testimony of a higher grade than the constitutional certificate.

2. Objections to the competency of a witness must be offered before his examination in chief. Where the alleged ground of incompetency was known when the witness was called and sworn without objection on that account, a motion to exclude the testimony, after he has testified, will not be available.

3. A witness will always be competent, if no other objection exists, to prove frauds committed by himself.

4. The certificate given by the judges of an election is not conclusive, and may be disproved by various methods. No rule of public policy forbids the introduction of the judges themselves as witnesses to disprove their certificate.

5. An objection of public policy against the admission of a certain description of testimony does not question its truth or its materiality. It asserts, in

effect, that the truth must be suppressed, if it is to come from a particular source. Such a claim should be founded on considerations which no adverse public policy can possibly transcend. In this instance, a paramount public policy lies in the verification of the popular will, as expressed through a popular election.

6. If the falsifying of ballots and returns at an election precinct be willfully perpetrated through fraud and corruption in the officers; or if, because of the irregularities, alterations, and falsifications appearing, it be found impossible to ascertain what was the true state of the polls, the entire vote of such precinct must be thrown out of the count. In other cases, where practicable, the true results may be ascertained from the condition of the ballots.

7. Tabular statement of results of·the Scheme and Charter election held August 22, 1876.

QUO WARRANTO information.

*Judgment for respondents.*

*James O. Broadhead, Chandler & Young, G. A. Finkelnburg, E. P. McCarty, H. M. Jones, D. D. Adams,* and *J. C. McGinnis,* for relator.

*Glover & Shepley, Wagner, Dyer & Emmons, Geo. A. Madill, Waldo P. Johnson,* and *Frank J. Bowman,* for respondents.

On·November 30, 1875, the Constitution of Missouri, which was adopted in Convention, August 2, 1875, went into effect. Sections 20 and 21 of article 9 of that Constitution are as follows:

" Sec. 20. The city of St. Louis may extend its limits so as to embrace the parks now without its boundaries, and other convenient and contiguous territory, and frame a charter for the government of the city thus enlarged, upon the following conditions, that is to say : The Council of the city and County Court of the county of St. Louis shall, at the request of the mayor of the city of St. Louis, meet in joint session and order an election, to be held as provided for general elections, by the qualified voters of the city and county, of a board of thirteen freeholders of such city or county, whose duty shall be to propose a scheme for the enlargement and definition of the boundaries of the city, the

reorganization of the government of the county, the adjustment of the relations between the city, thus enlarged, and the residue of St. Louis County, and the government of the city, thus enlarged, by a charter in harmony with and subject to the Constitution and laws of Missouri, which shall, among other things, provide for a chief executive and two houses of legislation, one of which shall be elected by general ticket, which Scheme and Charter shall be signed in duplicate by said board, or a majority of them, and one of them returned to the mayor of the city and the other to the presiding justice of the County Court within ninety days after the election of such board. Within thirty days thereafter the City Council and County Court shall submit such Scheme to the qualified voters of the whole county, and such Charter to the qualified voters of the city so enlarged, at an election to be held not less than twenty nor more than thirty days after the order therefor ; and if a majority of such qualified voters voting at such election shall ratify such Scheme and Charter, then such Scheme shall become the organic law of the county and city, and such Charter the organic law of the city ; and, at the end of sixty days thereafter, shall take the place of and supersede the Charter of St. Louis and all amendments thereof, and all special laws relating to St. Louis County inconsistent with such Scheme.

" Sec. 21. A copy of such Scheme and Charter, with a certificate thereto appended, signed by the mayor and authenticated by the seal of the city, and also signed by the presiding justice of the County Court and authenticated by the seal of the county, setting forth the submission of such Scheme and Charter to the qualified voters of such county and city, and its ratification by them, shall be made in duplicate, one of which shall be deposited in the office of the secretary of state, and the other, after being recorded in the office of the recorder of deeds of St. Louis County, shall be deposited among the archives of the city, and thereafter all courts shall take judicial notice thereof."

Under the provisions of section 20 thirteen freeholders were duly elected, who proposed a Scheme and framed a Charter, which, on August 22, 1876, were submitted to the qualified voters of the whole county of St. Louis, to be voted upon by them. It was assumed by the authorities that this election was to be carried on under and according to the general laws of the State applicable to St. Louis County, relating to elections, and accordingly no special provisions were taken by the mayor of St. Louis, or by the presiding justice of the County Court, to ascertain the result of the election. The poll-books were returned to the clerk of the County Court, and, after ascertaining the result as shown by the returns of the officers of election, he made his certificate as follows :

" *State of Missouri, county of St. Louis, ss.:*

" *St. Louis, August 26, 1876.*

" I, Ferdinand L. Garesché, clerk of the County Court, certify the following to be a fair abstract of the vote cast at the election held on the 22d instant for the adoption or rejection of the new Charter and Scheme of Separation, as proposed by the Board of Thirteen Freeholders of St. Louis County, under section 20, article 9, New Constitution of the State of Missouri, to wit :

New Charter —Yes......................11,858
New Charter — No......................11,300
Separation Scheme — Yes...............12,726
Separation Scheme —No................14,142
Rejected, blank, and scattering..........    65

" Witness my hand and the seal of said court hereto attached at the office in St. Louis, this 26th day of August, 1876.

[L. S.]        " FERD. L. GARESCHÉ, *Clerk.*"

This result was accepted, and the organization of the old county of St. Louis, as it had been, was kept up. On the first Tuesday after the first Monday in November, 1876, the general election for State and other officers took place ; and

candidates for the various offices existing under the organization of the old county of St. Louis were nominated and voted for, and afterwards qualified and entered upon the discharge of their duties. Prior to this election, however, on October 18, 1876, a petition for *mandamus* was filed in the Circuit Court for St. Louis County, in the case of *The State of Missouri*, ex rel. *Thomas J. Henley* et al., *Taxpayers, etc.*, v. *Henry Overstolz, Mayor of the City of St. Louis, and Charles Speck, Presiding Justice of the County Court*, reciting the proceedings that had taken place, and alleging that, at the election of August 22d, the Scheme and Charter were ratified by a majority of all the qualified voters of St. Louis County voting at the election ; that the mayor and presiding justice, though requested, had failed to make the proper certificate, etc. ; that they had taken no steps to inform themselves of the actual result of the election ; and praying that the proper certificate might be made, after they had satisfied themselves of the actual result, etc. In the course of this proceeding, commissioners were appointed to inspect and count the ballots, and report thereon, which they did. On December 29, 1876, a peremptory writ of *mandamus* was issued in this case, to which the mayor of the city and presiding justice of the County Court made return that they had satisfied themselves that the Scheme and Charter were ratified by a majority of the qualified voters voting at the election, and were prepared to make the certificate, etc., as required by section 21 of article 9 of the Constitution, and this was accordingly done, the certificate being dated December 29, 1876. During the course of these proceedings in the Circuit Court applications were made in this court for writs of prohibition to prevent the Circuit Court from proceeding in that case, as appears by the cases of *Barnes* et al. v. *Gottschalk, Judge, etc.*, et al., *ante*, pp. 109, 222. In January, 1877, the Governor of Missouri appointed the respondents in this case, Henry L. Sutton, James C. Edwards, and Joseph

Conway, judges of the County Court of the (new) county of St. Louis, as provided for by the Scheme, and they having qualified and met, in organization of the government of the new county, this suit was brought on January 23, 1877.

The amended information filed on February 5, 1877, after making allegations the substance of which has been given above, avers that at the election of August 22, 1876, there were voted by a majority of the qualified voters voting at the election, in the whole county, against the Scheme, 13,309 legal votes; that there were cast for the Scheme, in the whole county, not more than 12,160 ballots, and that the votes so cast were all the votes voted at the election, and that the Scheme was rejected by a majority of the qualified voters voting at the election, and that the return of the result was duly and legally certified by judges of election duly appointed and qualified to receive and count the votes and make return of the result thereof, who did receive, count, and return the votes, in accordance with the general election laws of the State applicable to St. Louis County; that the returns were duly certified, and, with the ballots, ballot-boxes, and poll-books, were duly returned to, and deposited with, the county clerk; that, the returns and votes having been duly canvassed, the clerk of the County Court made his certificate as above given; that the result was duly submitted to the mayor and presiding justice (who was at that time Justice Shultz; Justice Speck, who was elected on the basis that the old order of things was in operation at the time of the general election in November, 1876, having afterwards assumed to act as justice on Shultz's failure to do so), and that they accepted the result, and, proceeding according to the evidence, determined and decided that the Scheme had been rejected by a majority of the qualified voters voting at the election, whereby their jurisdiction and authority in the premises ceased and was exhausted; and that Justice Shultz had

never acted otherwise than according to his determination so evinced. The information then alleges that all the authorities of the city and county acted upon the basis thus established, as did the qualified voters and the State authorities, and that accordingly the general election of November, 1876, was ordered and held, as usual, independently of the Scheme and Charter, Justice Speck, among the other officers so elected, taking his seat as justice of the old County Court.

The making of the certificate by the mayor of the city and Justice Speck, as presiding justice of the County Court, is then alleged. The averment being that they did not hear evidence or determine any question touching the election or votes, but arbitrarily executed the certificate upon their individual caprice, contrary to truth and the fact and without any warrant of law. The information then charged usurpation of the functions of a County Court on the part of the respondents, they having been appointed and exercising powers upon the basis that the Scheme had been ratified at the election of August 22, 1876.

There was a demurrer to the amended information, on the ground that it did not state facts constituting a cause of action.

HAYDEN, J., delivered the opinion of the court upon the demurrer.

In this case the demurrer to the information will be overruled. Upon this result the law does not require any written opinion to be given by the court, and it would be unnecessary for us to do anything more than to announce our conclusion, were it not that counsel, in the absence of any knowledge as to the ground of the decision, might be embarrassed in their future proceedings. For this reason we will indicate, in an informal manner, some of the positions which, in the light of the facts as now presented to us, we hold to be correct, and which have led to the result of requiring the respondents to plead over.

The demurrer to the information admits the truth of the allegations of fact. It does not admit conclusions of law, nor does it admit conclusions of fact merely because they are pleaded. The only facts before the court at present are those alleged, and properly alleged, in the information.

It is contended, at the outset, by the respondents that the authentication by the mayor of the city of St. Louis and the presiding justice of the County Court to the certificate required by the 21st section of article 9 of the Constitution makes that certificate conclusive; that the certificate having been made according to the requirements of that section, and deposited as therein provided, is such proof of the fact that the Scheme and Charter were ratified by a majority of the qualified voters voting at the election that the actual fact cannot be investigated even in a court of law. It is admitted that this effect is extraordinary; that generally the effect of a certificate or return of officers appointed to canvass votes is merely to show the return to be true, in the absence of evidence properly adduced to the contrary. But it is contended that the Convention, representing the people in their sovereign capacity, had power to so provide, and has so provided. Unless it is perfectly clear that the construction contended for is the correct one, it ought not to be adopted, since it cannot be presumed, on slight reasons or in a doubtful case, that the Convention intended to disregard the fundamental maxims of constitutional government and to deprive the citizens of their right to resort to courts of justice for redress. It is said, in the first place, that the Constitution uses the words " qualified voters," and that the mayor and presiding justice were thus required to investigate and decide as to those qualifications. But, if the word " qualified " were not used, it would be implied, and its use adds nothing to the argument.

It is said that the words " and thereafter all courts shall take judicial notice " are used, and extraordinary effect is

claimed for them.    But these words and the effect are based
upon this : that the Scheme and Charter have been ratified.
None of the effects, great or small, produced by anything
to be done under the 21st section are to follow, except in the
event of the Scheme and Charter being ratified as provided
in the 20th section.    We must look at these sections, not
as they appear to us now, familiar as we are with the com-
plications that have arisen, of which it is hardly possible to
free our minds, but with the mental eye of the law-giver,
as he was preparing them, or as they lay perfected under
his hand.    There will be, then, little doubt as to their
meaning.    The office and the purpose of section 21 is en-
tirely distinct from that of section 20.    The law-giver
might have omitted section 21, without destroying the force
of any provision of section 20.    The scope of section 21 is
evidentiary.    It marks, officially, the accomplishment of an
act, so far as a provision evidently intended to make *prima-
facie* evidence can, and provides a record for the future.
The law-giver could not anticipate a contest, and the tenor
of section 21 supposes that the Scheme and Charter have
been ratified.    On this basis the evidentiary proceedings are
to be taken ; a certificate is to be made, signed, and sealed.
The words indicative of discussion and deliberation are not
there, nor any words tending to show a design to supersede
the functions of a court of justice.    The powers implied are
ministerial powers.    Altogether, the construction of this
section of the Constitution, in this respect, cannot be pro-
nounced doubtful ; but even in the case of a doubtful con-
struction, where, upon the words of a section, the deter-
mination might be either one way or the other, a decision
that the relator cannot go behind the certificate would be
adapted to a tribunal that is content to administer the shell,
rather than the substance, of the law.

   But it is said that the certificate of the mayor and presid-
ing justice is an official return, and that, if only *prima-facie*
evidence, it is sufficient here, because there are no aver-

ments to impeach it in the information ; that the allegations
of the information are merely to the effect that the majority
of lawful votes was cast against the Scheme and Char-
ter, and that these did not become the organic law, etc. ;
that there is no specification of the grounds upon which it is
sought to contest the election, no description of fraudulent
and illegal votes.   This objection certainly cannot be good,
unless we can say upon the face of the information that the
relator intends to introduce evidence as to fraudulent and
illegal votes, or evidence of a similar character.   We have
no knowledge before us except that gathered from the face
of the information.   We cannot *presume* that there is some-
thing hidden under the allegations of the relator, and that
those allegations are mere argumentative results, and not
the direct averments of a good pleader.   It may be that
the relator does not intend to attack a single vote, or ques-
tion the validity of any one ballot that was cast.   His
case may be that every ballot cast was a legal ballot, polled
by a qualified voter ; that the question is merely one of num-
bers.   The information charges that the two officials who
made the certificate did not determine " any question
touching said election, or the votes cast thereat," or " make
any actual canvass of said votes," but " arbitrarily, and
without evidence," " separately signed and executed said
certificate upon their individual caprice," etc.   Thus, even
if we grant that the certificate corresponds to the face of
the returns, we cannot say now what specifications, or that
any specifications, are necessary.   But the premise of the
respondents' argument, the position that the certificate
is the face of the returns, is an assumption.   It cannot be
assumed that the certificate is the face of the returns, and
that on the face of the returns there was a majority of
legal votes for the Scheme and Charter.   This may have
been so, or it may not.   But the fact that the certificate is
*prima-facie* evidence of the facts required by the 21st sec-
tion to be set forth in the certificate does not, at this stage

of the case, at least, imply anything as to the means by which the two officials arrived at the result. We neither presume that they did, nor that they did not, go according to the face of the official returns. We give the certificate its legal effect as *prima-facie* evidence, and stop there. Then we consider the allegations of the information attacking that certificate.

We cannot, therefore, presume that this is a case where the party making the allegations which are complained of as insufficient intends to attack the face of the official returns, and to prove that what appears to be a majority of the votes is really a minority by proving that some of the majority votes were not legal votes; in other words, that the apparent result is not the real result, owing to the fact that particular votes have illegally been counted. In *The State* ex rel. v. *Vail*, 53 Mo. 97, there was a motion for judgment on the pleadings, which brought certain facts before the court and enabled the court to see that the allegation of the plea that the respondent was elected by a majority of the qualified voters was a mere cover for the allegation that illegal votes were cast for Dinning, the other candidate, and that thereby the respondent was elected. In *The State* ex rel. v. *Townsley*, 56 Mo. 107, there was a trial, and issues were made up. The respondent alleged that he was duly elected. The replication denied this, and set up specifically the votes received in the different counties by Wood, the other candidate, showing a majority for Wood on the face of the returns, and showing that the secretary of state refused to open or count the returns from Jackson County, which returns gave Wood his majority. The rejoinder merely denied the allegations of the replication. At the trial the respondent claimed the right to go behind the returns, and show that the returns and abstracts from Jackson County were false, and that he was legally elected. The court held that the issue had not been made by respondent in his pleadings;

that under his general averment he could not attack the face of the returns and prove that the voters who constituted Wood's majority were illegal voters, or that their votes ought not to have been counted. It is evident, for the reasons above given, that the rule laid down by the Supreme Court in these cases has no application to the facts before us. Whatever may be the result, we cannot now assume that the relator intends to prove the allegations of the information by showing illegal votes, or such other irregularities as would indirectly, and on his own theory of the law, give a legal majority against the Scheme and Charter. We must take the allegations of the information as we find them.

It is said, in the next place, that the information is insufficient because it does not show any notice to the respondents, whose commissions are attacked, of an intention to contest, or any specifications of grounds, as required by the election law. Wag. Stat. 573, sec. 52 *et seq*. It is sufficient to say that these sections refer to elections where there are persons opposing each other as contesting candidates. There are no apt words to fit an election of this kind, and every section contains references more or less distinct and direct to persons voted for, certificates given to candidates, or other features indicative of offices in contest. Both the Vail and Townsley cases were personal contests, and the remarks made in those cases in regard to contests between individuals do not apply to the facts of this case. Counsel have argued at the bar, in this case, as though some of the main positions taken by this court in the case of *Barnes* v. *Gottschalk* were still open to review. Some remarks were made incidentally there, but we do not consider it open to question that the mayor of the city of St. Louis and the presiding justice of the County Court were the proper canvassing officers for the election for the Scheme and Charter, under the Constitution ; and we may repeat here what was in substance said in that opinion, that upon the filing of the certificate, as provided in section 21 of article

9 of the Constitution, the matter was in shape for a contest of the election by *quo warranto*.

This leads to the question whether such a certificate has been filed. In what we have said above in regard to the certificate being *prima-facie* evidence, we have assumed, in respect to it, a compliance with the constitutional provisions, because it was more convenient to consider the questions in this order. But it is contended by the relator that Charles Speck never had any authority to act; that he was not the officer designated to act, but that Chauncey L. Shultz is the person who should, with the mayor of St. Louis, have made the certificate. The allegations of the information are that said Shultz was the "lawful presiding justice" of the County Court of St. Louis County, "and was acting as such, and continued to be and act until the —— day of December, A. D. 1876, upon which last-named day Charles Speck assumed and took upon himself to act and perform the functions of said office of presiding justice of said court, under claim of an election thereto held on the 7th day of November, 1876, under the laws applicable to said county as they existed prior to, and independent of, the said proposed Scheme, and by no other warrant or claim whatever;" "that thereafterwards, on or about the 29th day of December, 1876, the mayor of the city of St. Louis and Charles Speck, claiming to have then become the presiding justice of said court by virtue of said election of November 7, 1876, as aforesaid, notwithstanding the fact that said proposed Scheme was in no manner ratified," etc., " did wrongfully, and without any lawful authority, make and execute the following certificate," etc.,; that " the said Speck, claiming to be, and acting as, presiding justice as aforesaid, did not hear or determine, in fact or law, any question," etc. The information then avers that no election for justices of the County Court of the new county was held, for the reason that the result of the Scheme and Charter election was accepted as a

defeat of the Scheme, etc., until after December 29, 1876, when the certificate was made by the mayor and the pre siding justice, etc. In the face of these allegations in the information, the relator cannot well maintain that Charles Speck was not at the time of the signing of the certificate a *de-facto* officer. The allegations, so far as they describe the facts, rather than draw inferences, do not point to an intruder or usurper, but describe an officer taking his place under color of an election, and acting in it in place of his predecessor, who had ceased to act. Indeed, the allegations of the information go beyond the requirements neces sary to make a *de-facto* officer.

Lord Holt's definition, approved by Lord Ellenborough, was, " one who has the reputation of being the officer he assumes to be, and yet is not a good officer in point of law." It is said that this definition has never been questioned in England, and is now the rule there. In *The State* v. *Carroll*, 38 Conn. 467, a carefully-considered case, it is said : " But, to protect those who dealt with such officers when apparent incumbents of offices under such apparent circumstances of reputation or color as would lead men to suppose they were legal officers, the law validated their acts as to the public and third persons, on the ground that, as to them, though not officers *de jure*, they were officers in fact, whose acts public policy required should be considered valid. It was not because of any quality or character *conferred upon the officer*, or attached to him by reason of any defective election or appointment, but a name or character given to his acts by the law, for the purpose of validating them."

The *de-facto* principle is one of the oldest and most firmly established in the common law. Perhaps no more memorable instance of its application can be cited than that exhibited by the conduct of Sir Matthew Hale. On the death of Charles I., Charles II. immediately became king of England *de jure;* and the years of the reign of Charles II. are to this day counted from the death of Charles I. Yet there

was an interval of eleven years between the death of Charles I. and the restoration of Charles II., during the greater part of which, under the Protector, a powerful government, keeping perfect order, existed. Sir Matthew Hale, though he never formally recognized the government of Cromwell, sat as judge of the Common Bench, as the Court of King's Bench was called in Cromwell's time, not only in cases involving property, but in cases which involved life and death. At the Restoration he sat in the same court as Lord Chief Justice of the King's Bench. His explanation has often been quoted, to the effect that the public business must go on, and justice be administered, alike under *de-facto* and *de-jure* governments. The modern instances in which the rule has been applied are numerous, and perhaps the largest class of cases is that in which new counties have been formed, by legislative acts, out of old ones, and the old officers have continued to act, in the new jurisdiction, prior to the organization of the new counties. The acts must be construed according to the intention of the law-giver, and not according to the literal words, when such a construction would violate that intention. As the Supreme Court of California said in *The People* v. *Maguire*, 32 Cal. 143 (and the language is of general application), " so far as defining its boundaries is concerned, the act itself forms the county; but so far as its organization is concerned, it merely directs how it shall be accomplished. To constitute a county, something more is required than to define its boundaries. A local government must be provided, and the creation of the county is not accomplished until both these things have been done in the appointed mode." *Mason* v. *Woerner*, 18 Mo. 566. We do not think that it is necessary to resort to the 4th section of the Scheme to show that Speck had authority to act, or that the position is tenable that, by the Constitution, Shultz was the person, and the only person, who could make the certificate. By reason of the existing state of things, it must be considered the intent of the law-giver

that the operation of the law should be carried forward; and the presiding justice of the County Court for the time being is the person clearly intended.

The point is made by the relator that, as the election for the Scheme and Charter took place August 22, 1876, and the certificate was not made till December 29, 1876, the certificate had no legal force. This may be considered in connection with the objection that the power to make the certificate was exhausted, that the officers were *functi officio*, and that there could be no second action. The information, however, does not charge any first action, except so far as mental determination is a kind of action. The allegation is that the mayor and Justice Shultz decided that the Scheme had been duly rejected, etc.; but it does not appear that any steps were taken. Even if they did so determine, and evinced their resolution by acts, it is difficult to see how their determination, followed by any such action as that described, can conclude the respondents. It does not appear that the officers made any examination for themselves, or caused any to be made. It would appear that they relied upon the returns and certificates of others, not made for them or exhibited to them in such a way that they could see anything but results. *Barnes* v. *Gottschalk*, *ante*, pp. 109, 122. Altogether, there are no allegations showing any such performance as to warrant that which, as stated in the information, is a mere conclusion of law, that the officers had exhausted their powers, even if they could have exhausted them. The Constitution names no time within which the act must be done. The argument, stated in its fullest force, resolves itself into one from inconvenience. It may be said, Is there no limit to the operation of such discoveries? On the supposition that a majority of the qualified voters have voted in favor of a new order of things, may the community rest for years in the belief that that order of things has been defeated, and then wake up to find it enforced against them? The diffi-

culty is the practical difficulty continually presented in the application of legal rules — where to draw the line. As the counsel for the respondents has said, there is no statute of limitations, and it is difficult to see how a court can say that a bar has been interposed, without some positive enactment.

Upon what is now before us, accordingly, we conclude that the certificate of the mayor and the presiding justice is *prima-facie* evidence of the facts required by the 21st section of the 9th article of the Constitution to be stated in it, and we cannot say that that certificate was not made in accordance with the constitutional provisions. The relator attacks this certificate, and seeks to rebut and overthrow the presumption which it raises. As on the face of the information we hold its averments to be sufficient, the demurrer is overruled. All the judges concur.

The amended answer to the information averred the ratification of the Scheme at the election, and contained various averments, the nature of the more material of which appears from the opinion delivered on the motion to strike out parts of it and from the final opinion in the case.

HAYDEN, J., delivered the opinion of the court upon the motion to strike out.

For brevity, many of the allegations of the answer to which this motion goes may be treated by classes. Certain allegations are " that ballots against the Scheme and Charter [giving the numbers], not voted by any voter, were placed in the ballot-boxes, and counted by the judges of election against the Scheme;" other allegations are " that ballots voted by legal and qualified voters were destroyed and not counted by the judges, which should have been counted for the Scheme;" other allegations are " that the judges intentionally omitted to take the oath required by law;" " that the returns of the judges for [such and such] precincts were false, and that the returns do not show the

whole number of votes cast at such precincts ;" that of such and such numbers, naming them, cast against the Scheme, such and such votes, naming the numbers, " not voted, were placed in the ballot-boxes." Concluding the more specific allegations relating to the different precincts, are allegations that said returns as made by such and such judges, at such and such precincts, " were otherwise false and fraudulent, and are no legal returns ; that said returns are so tainted with fraud that it cannot be told what votes were given for or against the Scheme and Charter."

These are specimens of the allegations which we think are correctly made. It is, indeed, claimed upon the part of the relator that the court ought not to go beyond the returns. The ground taken seems to be, further, that the court should not go into the underlying question, whether the Scheme and Charter were ratified by a majority of the legal voters voting at the election of August 22, 1876, but should merely decide whether the mayor and presiding justice acted properly in making and filing the certificate. But we do not sit here to revise the ministerial acts of these officers. This court proceeds judicially, and will ascertain from the evidence the will of the electors. That is the underlying question to be decided ; and these allegations, bearing as they do upon that question, are properly pleaded. The office of the certificate is to make *prima-facie* evidence. When the certificate has performed this office, its function is ended for the time being, it having availed to shift the burden of proof in the contest.

In *The State* ex rel. v. *Townsley*, 56 Mo. 107, on which case the relator relies, the secretary of state had only the returns and the abstracts from Jackson County to proceed upon ; but the mayor and presiding justice, in this case, had other things to proceed upon besides the abstract of the clerk of the County Court and the returns of the judges of election. From that case, moreover, the inference is to be drawn that, where there is no statute regulating the matter,

the court will, in a proceeding in the nature of a *quo warranto*, go into the whole question. In fact, where there is no statute, we are forced to resort to *quo warranto*, and this fails of its purpose if it does not bring up the ultimate question, What was the decision of the electors as legally expressed? It is of vital importance that there should be some proceeding by which the rights of the citizen and the purity of the ballot may be preserved. The purity of the ballot lies at the foundation of elective governments, and it is impossible to preserve the rights of the citizen unless it is preserved. But by what proceeding can this object be accomplished, if not by *quo warranto?*

Perhaps the most difficult question arising is in regard to the numbering of the ballots. The allegation is made that in such a return there were no proper numbers placed upon the ballots, and the names of the voters casting such ballots, in the order in which they voted, were not entered upon such ballots or upon the poll-books, as required by the Constitution. We have examined the different acts of the Legislature upon this subject, but it is not necessary here to give more than our conclusion, which is that, as the laws stand, the mere omission to number the ballots does not have the effect of invalidating the ballot and depriving the voter of his vote. The Constitution contains no mandatory words such as existed in the act of 1863 (Sess. Acts 1863, p. 17, sec. —; Wag. Stat. 566, sec. 15), to the effect that no ballot not numbered shall be counted. Sess. Acts 1875, p. 53. Unless the words are clear, we ought not to give them such an effect as will deprive the voter of his vote merely because the officer of election does not number the ballot. The design of the 3d section of article 8 of the Constitution, as it stands, would seem to be to reconcile, as far as possible, two things which are difficult to be reconciled. One of the primary objects is to preserve the purity of the ballot. Without this, elective government is at an end. Another important object is to secure the se-

crecy of the ballot. The voter has a right to vote as he pleases, and is not to be subjected to any control or interference on the part of others. These two things, to a certain extent, clash. If there were to be contested elections, ballots must be examined, and, on investigation, it may become known how voters voted.

The motion to strike out will be overruled, except as to those allegations which relate to the failure to number ballots. These can be stricken out without injury to the other clauses, and the pleading, thus altered, will stand. All the judges concur.

LEWIS, P. J., delivered the opinion of the court upon the information.

The information in the nature of a *quo warranto*, filed as an original proceeding in this court, charges, in effect, that the defendants are usurping the offices of justices of the County Court of St. Louis County, under appointments made by the governor, upon an unfounded assumption that the Scheme of Separation of city and county, and the City Charter, submitted to a vote of the people on August 22, 1876, were ratified and adopted in that election. It admits that a certificate of such ratification and adoption, signed and duly authenticated by the mayor of the city and the presiding justice of the County Court, was made and deposited as directed by the 21st section of article 9 of the State Constitution; but avers that this certificate was untrue, and that the Scheme and Charter were in fact rejected at the election referred to. The respondents, answering, declare that the certificate was true; that at said election at least 12,160 votes were cast in favor of the Scheme and Charter, and not more than 8,904 against them. They further aver that at certain specified precincts enormous frauds were perpetrated by the election judges, and false returns of results were made by them, so as to make it appear that large majorities had been given against the Scheme and Charter, when in fact the true ma-

jorities were in their favor. A reply denies all the material allegations in the answer. Some other issues are raised by the pleadings, but the foregoing statement exhibits the material features of the controversy.

On the trial the relator, after showing the various steps taken preparatory to the election, introduced in evidence the whole of the returns, as certified by the judges of election of the sixty-nine precincts in the city and county, and rested. The footings of these returns exhibit the general result of the votes cast, as follows:

For the Charter........................11,858
Against the Charter....................11,300

Majority for the Charter..............  558

For the Scheme of Separation............12,726
Against the Scheme of Separation........14,142

Majority against the Scheme............1,416

The respondents here assume the burden of proof to destroy the supposed effect of the judges' returns. They introduce as witnesses, successively, nine judges and three clerks, who had officiated at one or another of four different precincts, whose several statements — some of them differing slightly in immaterial particulars — tended to show the following facts:

First, that at the Middle Precinct of the Fifth Ward neither judges nor clerks were sworn; that a majority of votes were actually cast in favor of the Scheme and Charter, but the judges and clerks, by suppressing or destroying a large number of ballots given in their favor, and adding a larger number of spurious ballots against them, made an apparent result of 450 majority against the Scheme and Charter; that after the election the poll-books and ballots were gone over by the clerks and two of the judges, together with a man having no official connection with the

election, when the word "voted" was written on the poll-books, opposite a large number of names of persons who had not voted, and spurious ballots against the Scheme and Charter were numbered to correspond with the false entries, and placed upon the string; that, after the certificates and returns were signed by the judges, the figures showing the whole number of votes cast and the number cast against the Scheme and Charter were surreptitiously altered, so as to increase each number by 100 or more; that one of the judges, being unable to read or write, knew absolutely nothing of what was going on, except that he received ballots from persons outside and passed them to another.

Second, that at the Eastern Precinct of the Fifth Ward the same processes were carried on, of destroying large numbers of ballots cast in favor of the Scheme and Charter and depositing hundreds of spurious ballots against them; that after the election the ballots were taken out of the box and carried in a handkerchief or newspaper, by one of the judges, to a saloon on the Levee, where the greater part of the night was spent by judges and clerks in altering the poll-books by additions of the word "voted," where required, to make them correspond with the fraudulent additions of ballots not cast by the voters; that early the next morning the ballots were taken back in the same manner and placed in the box, which was then sealed up and delivered to the county clerk. No one could approximate the actual vote of the precinct, but the returns were made to show 227 votes for, and 900 against, the Scheme and Charter.

Third, that at the Middle Precinct of the Ninth Ward about 700 votes in all were cast, giving a majority in favor of the Scheme and Charter; that the judges and clerks, by adding hundreds of spurious ballots and destroying real ones, created a false showing of 1,305 votes against the Scheme and Charter to eighty-three in their favor.

The respondents also exhibited in evidence the condition of the ballots cast at five different precincts, as described in

the report of commissioners appointed by the St. Louis Circuit Court, in the progress of a certain cause, to examine them. This testimony tended to show:

First, that in the Middle Precinct of the Fifth Ward the certificate of the judges exhibited a total of sixty-four votes more than were shown by the ballots; that in the Eastern Precinct of the Fifth Ward there appeared a like excess in the certificate, over the ballots, of 162; in the Middle Precinct of the Sixth Ward appeared a similar excess of eighty-nine, and in the Eastern Precinct of the Ninth Ward a like excess of 193.

Second, that in the four precincts last mentioned, together with the Middle Precinct of the Ninth Ward, there were found 503 duplicate and triplicate ballots.

Third, that in four of these precincts there appeared to have been cast 229 votes by persons noted on the poll-books as " dead," " removed," or " stricken off by the revisors."

Fourth, that in three of these precincts about 150 ballots had never been folded or creased, and therefore could not have been passed through the apertures in the tops of the boxes.

Fifth, that in the Middle Precinct of the Sixth Ward the judge's certificate declared a majority of 110 against the Scheme and Charter, while the ballots showed a majority of nineteen in their favor.

When the relator, after submitting the certificates of the judges of election, rested, it seemed to be assumed, on his part, that enough had been done to overthrow the *prima-facie* case made by the certificate of the mayor and the presiding justice. We were not then called upon to say whether his theory was or was not correct. But we do not perceive how it could be reconciled with the opinions heretofore delivered by this court.

The one great question to whose solution all others must tend, in this investigation, is, What decision was pronounced by the majority of lawful votes actually cast at the election

on August 22, 1876? The State Constitution has provided for one answer to this question, in the certificate made by the mayor and the presiding justice. We have held that this answer is not a conclusive one, and was never intended so to be. It is *prima-facie* evidence only of what it declares. But we have never intimated that it could be successfully rebutted by evidence no better than itself. Are the certificates of election judges any better or higher evidence than the certificates of officers specially directed by the Constitution to certify to the same matter?

The mayor and presiding justice having to certify, not merely the returns of the election officers, but the actual result of the election, are presumed to have had access to the highest sources of information.

The Constitution, in providing for an inspection of the ballots in any case of a contested election, seems to say that the ballots themselves are the best evidence of the true result. For aught that appears before us, the certificate of the mayor and the presiding justice may have been based upon this highest grade of evidence. We cannot, at least, assume the contrary. The certificates of the election judges have no better foundation. We have said, in effect, that these were evidence to be used for so much as they might be worth in disproving the truth of the certificate provided for by the Constitution. But we have never said, and could not consistently say, that, unsupported by the higher evidence of the ballots, or by any other testimony, they would be in themselves conclusive against the constitutional certificate. Our argument assumes, of course, that the ballots have not been tampered with since they left the hands of the judges. Such is the necessary presumption, since it is not shown that they have been at any time in other than lawful custody.

We might here pause, and decide this case against the relator upon the insufficiency of his proofs to rebut the presumption raised by the certificate of the mayor and presid-

ing justice. But considerations of grave import, arising upon the whole testimony before us, demand that this cause be determined upon principles more clearly adjusted to the common understanding of public and private right, uninfluenced by the strict rules of judicial procedure.

The relator moves the court to exclude from consideration all the testimony of the election officers which tends to impeach their returns. He insists that, on grounds of public policy, an officer cannot be heard in any case to testify that an official certificate given by himself is false. There is some disagreement among the authorities upon the question thus presented. In *Central Bank* v. *Copeland*, 18 Md. 305, it was held that "the magistrate who took the acknowledgment of a married woman to a deed is not, from considerations of public policy, if from no other, a competent witness to contradict or impeach his certificate of the acknowledgment." In *Highberger* v. *Stiffler*, 21 Md. 338, the same court reasserted the rule, with the qualification that the officer might testify to facts tending to invalidate the instrument acknowledged, but not contradicting his certificate.

In *Briggs* v. *Stafford*, 14 La. 381, it was declared that "a public officer who has given a solemn certificate in his official character cannot be listened to as a witness to prove it false." This was reaffirmed in *Peet* v. *Dougherty*, 7 Rob. (La.) 85. Each case was that of a notary who had certified a protest.

In *Stone* v. *Atwood*, 28 Ill. 30, it was held that "an arbitrator may be examined as a witness to sustain, but not to impeach, his award."

In *Harkins* v. *Forsyth*, 11 Leigh, 294, the testimony of a magistrate to contradict his certificate of a married woman's acknowledgment was held inadmissible. But this ruling was put on the distinct ground that such certificates were conclusive, and not impeachable by any sort of testimony. "The deed," said the court, "is made to de-

pend, not upon the *truth* of the certificate, but upon its existence." It need hardly be said that no such doctrine prevails in Missouri. On the other hand, in *Jackson* v. *Humphrey*, 1 Johns. 498, a county judge had certified the proof of execution of a deed as having been taken in Cayuga County, New York. He was called as a witness to contradict his certificate by showing that the proof was really taken in Canada, and therefore void. Chief Justice Kent, delivering the opinion of the court, said that the judge was a competent witness for the purpose, but "he would not have been bound to answer any questions impeaching the integrity of his conduct as a public officer."

In *Louden* v. *Blythe*, 16 Tenn. 532, a justice of the peace who had taken and certified a married woman's acknowledgment was permitted to testify to facts which destroyed the validity of his certificate.

In *Michener* v. *Cavender*, 38 Pa. St. 334, the alderman who had taken and certified an acknowledgment testified, "under exception to his competency as a witness to contradict his own official acts," in impeachment of the truth of his certificate. The question of competency was thus distinctly raised at the trial, and was again discussed in the Supreme Court. The latter paid no regard to the exception, but gave full effect to the testimony. The question has never been directly passed upon by the Supreme Court of Missouri. In two cases, however, the action of that tribunal implied a tacit acquiescence in the admissibility of the testimony of a canvassing officer to impeach his own certificate. In *The State* ex rel. v. *Rodman*, 43 Mo. 256, the defendant, as secretary of state, had certified to the governor, in due form, that Elijah Perry had received the highest number of votes for judge of the Eighteenth Circuit. His testimony was received by the Supreme Court to prove that this conclusion was reached by leaving out the votes cast in two counties of the circuit. The court held that he had violated the law in excluding those counties ; which was

saying, in effect, that the fact of their exclusion falsified the certificate. No question was raised, by court or counsel, upon the admissibility of the officer's testimony to make out the facts by which his certificate was invalidated.

In *The State* ex rel. v. *Townsley*, 56 Mo. 107, the facts were similar, and the testimony of the secretary of state to like effect was fully considered by the Supreme Court. Again no question was raised as to its admissibility.

Counsel for the relator urge the distinction taken between the testimony of certifying officers to impeach their certificates, and that introduced for the purpose of sustaining them. Some of the authorities above cited show that the distinction has frequently failed of recognition. We are reminded that, in all of the election cases examined, the election officers testified in support of their returns. But this proves little or nothing until it is shown that the courts have refused to hear them on the other side. No such case is produced, and we believe that none is to be found in the reports. The cases are numerous, however, in which, upon cross-examination, the election officers have sworn to facts directly impeaching their certified returns. With such a judicial history of the question before us, it would be exceedingly unsafe to affirm as a settled rule of law in Missouri that an election officer can never be heard to testify in hostility to his return. We consider that in such a case as the present, at least, the question is here open to those tests of principle by which, only, the administration of the law may prove the faithful guardianship of justice.

As this case stands, the application of a well-settled rule of practice would deprive the relator of all benefit of his objections to the competency of the witnesses, even if under other circumstances the objections might prevail. Starkie says : " Indeed, any objection to competency ought to be taken in the first instance, and before the witness has been examined in chief; for otherwise it would be an unfair advantage to the other party, who would avail himself of

the testimony of the witness if it were favorable, but would get rid of it by raising the objection if it turned out to be adverse." Stark. on Ev. 114.

The rule and its reason readily adapt themselves to the case before us. No objection against the competency of the witnesses was suggested until five election officers had fully testified, and a sixth was undergoing examination. In any view of the question of personal competency, as to these five witnesses, at least, we could not properly exclude their testimony. But we are still not disposed to base any general conclusion on technical grounds, when more satisfactory reasons appear in the merits of the controversy.

The rule, as recognized in the instances shown, which forbids an officer's impeaching his own certificate, had doubtless a common origin with that which formerly would not allow a witness to cast a shadow on his own attestation of a will. The exigencies of " public policy " were once perpetually clamoring against the supposed horrors of self-stultification, but the common-sense tendencies of later jurisprudence have long since ignored those phantoms. By the doctrine now prevailing, no man can be so steeped in fraud as not to be a competent witness to prove it. His turpitude, which formerly might have driven him from the witness-stand, now only affects his credibility. The tryers of fact are properly intrusted with authority to believe or disbelieve him, according to the impression created by all the circumstances and surroundings of his testimony. The reasons are very few which may be advanced against a like treatment of official witnesses brought to testify about their official acts.

But, supposing the rule of exclusion to be unquestionable as applied to notaries public and some other officials, are the judges of election, in the present instance, officers to whom the rule will equally apply? An acknowledgment or a protest can be proved by the notary's certificate only. His oral testimony will not serve for an authentication of the

act.  The law, in prescribing a single mode of authentication, invests it with a certain sanctity, which the officer specially intrusted with its guardianship may not violate.  The State has virtually indorsed the truth of his certificate.  But the certificates of these election officers have no such distinguishing indorsement.  They are not the only evidence of the facts certified, nor are they the best.  They certify, not so much to official acts performed, as to footings of results, which, if untrue, may be disproved by any expert in arithmetic.  The voter's choice is independent of any act of the officer, and is even unknown to him. Yet he certifies to it from the face of the ballot, which is better evidence than the certificate.  Viewed by these lights, there seems to be little left in the certificates of that official, State-indorsed sancity which should forever seal the mouths of the officers against any disproof of their accuracy.

An objection of public policy against the admission of particular testimony may be commended for its allegiance to the interests of the State, but it is odious in its relation to the administration of justice.  It does not question the truth or materiality of the testimony; but it asserts that the truth itself must be suppressed if it is to come from a particular source.  It demands that the wrong party shall recover; that the innocent and rightful party shall be adjudged against; that every personal interest and every personal right shall yield to judicial spoliation, if need be, rather than that a possible detriment may accrue to the common weal.  The party raising such an objection seems to admit that the testimony would hurt his cause.  His anxiety for the public welfare may, in some cases, find a stimulus in his greater anxiety to avoid an exposure of the weakness of his claim.  When courts of justice may be by such means diverted from the purposes of their sacred office in adjusting by every attainable test of truth the conflicting claims of parties litigant, it should be because of some substantial

claim of public policy, which no conflicting claim is able to transcend.   The highest requirement of public policy ever asserted for this rule of exclusion is that there shall be no unsettling of public acts, producing uncertainty and confusion in the minds of the people.   But suppose that a higher public policy should appear, with the demand that no reservation or exclusion shall cover any source from which the truth is possible to be obtained.   Can any aspect of public policy be more imposing than that which speaks for a verification of the popular will as expressed through a popular election?  The life-blood of our political system, with all its guarantees of life, liberty, and happiness, must flow or cease to flow, accordingly as that verification shall habitually stand or fall.   The will of the people, constitutionally expressed, should be the supreme law, not merely of the land, but in the heart of every citizen.   The moral treason which would belie this should find no escape through a technicality shaped to fit some form of public policy infinitely inferior to that which demands its prompt and certain arrest.   When our judiciary, hitherto supposed to be the sure refuge of the people from all despoilers of their majority rights asserted in constitutional form, shall be found hunting for methods of desertion from that post of duty, it will be time to despair of the permanency of all institutions devised for the well-being of mankind.  'We cannot on this occasion yield to any such suggestions of public policy as have been here advanced for the rejection of the testimony of the election officers.

It remains for us to announce the conclusions of fact to which the evidence has led us, with their necessary legal results as recognized by this court.

Admitting the full weight of considerations upon which counsel have dwelt as unfavorable to the credibility of some of the witnesses, we yet find ourselves, in view of their demeanor on the stand, and a mass of corroborating circumstances and surroundings, thoroughly convinced that

their material statements are substantially true. We therefore find established, by a preponderance of testimony, the facts set out near the commencement of this opinion as presented in the testimony submitted.

By the law governing such cases, if the falsifying of ballots and returns at a precinct be willfully perpetrated, through fraud and corruption in the officers, or if, because of the irregularities, alterations, and falsifications appearing, it be found impossible to ascertain what was the true state of the polls, then the entire vote of such precinct must be thrown out of the count. *Judkins* v. *Hill*, 50 N. H. 140; *Littlefield* v. *Green*, Brightly's Elect. Cas. 493; *Russell* v. *The State*, 11 Kan. 308.

We find both these conditions attaching to the following-named precincts; so that the numbers of votes marked opposite, respectively, will be deducted from the aggregated results as reported by the judges of election:

ELECTION FOR CHARTER.

|  | *For.* | *Against.* |
|---|---|---|
| Fifth Ward, Middle Precinct | 146 | 596 |
| Fifth Ward, Eastern Precinct | 227 | 900 |
| Ninth Ward, Middle Precinct | 83 | 1,307 |
| Totals to be deducted | 456 | 2,803 |

ELECTION FOR SCHEME.

|  | *For.* | *Against.* |
|---|---|---|
| Fifth Ward, Middle Precinct | 146 | 596 |
| Fifth Ward, Eastern Precinct | 227 | 900 |
| Ninth Ward, Middle Precinct | 83 | 1,305 |
| Totals to be deducted | 456 | 2,801 |

Taking the condition of the ballots as our guide, in preference to the returns of the judges, and correcting the discrepancies, we find the following as the true results in the precincts named respectively:

### ELECTION FOR CHARTER.

|                                    | For. | Against. |
| ---------------------------------- | ---- | -------- |
| Sixth Ward, Middle Precinct....... | 262  | 246      |
| Ninth Ward, Eastern Precinct...... | 381  | 421      |
| Totals........................     | 643  | 667      |

### ELECTION FOR SCHEME.

|                                    | For. | Against. |
| ---------------------------------- | ---- | -------- |
| Sixth Ward, Middle Precinct....... | 264  | 242      |
| Ninth Ward, Eastern Precinct...... | 383  | 420      |
| Totals........................     | 647  | 662      |

These figures will, therefore, be substituted for those reported by the judges, which are as follows:

### ELECTION FOR CHARTER.

|                                    | For. | Against. |
| ---------------------------------- | ---- | -------- |
| Sixth Ward, Middle Precinct....... | 287  | 397      |
| Ninth Ward, Eastern Precinct...... | 449  | 679      |
| Totals........................     | 736  | 1,076    |

### ELECTION FOR SCHEME.

|                                    | For. | Against. |
| ---------------------------------- | ---- | -------- |
| Sixth Ward, Middle Precinct...... | 287  | 396      |
| Ninth Ward, Eastern Precinct...... | 449  | 679      |
| Totals........................    | 736  | 1,075    |

### GENERAL RESULT OF ELECTION FOR CHARTER.

|                                    | For.   | Against. |
| ---------------------------------- | ------ | -------- |
| Aggregates returned by judges...   | 11,858 | 11,300   |
| Totals to be deducted..........    | 1,192  | 3,879    |
|                                    | 10,666 | 7,421    |
| Add figures substituted as above.. | 643    | 667      |
| Ascertained results.............   | 11,309 | 8,088    |
| Majority for Charter.........      | 3,221  |          |

ELECTION FOR SCHEME.

|                                      | *For.*  | *Against.* |
|--------------------------------------|---------|------------|
| Aggregates returned by judges...     | 12,726  | 14,142     |
| Totals to be deducted...........     | 1,192   | 3,876      |
|                                      | 11,534  | 10,266     |
| Add figures substituted as above..   | 647     | 662        |
| Ascertained results..............    | 12,181  | 10,928     |
| Majority for Scheme.........         | 1,253   |            |

It follows that the Scheme of Separation and Charter of the city were duly ratified and adopted at the election held on August 22, 1876, as certified by the mayor of the city and the presiding justice of the County Court, and judgment is, therefore, rendered for the defendants. All the judges concur.