## W. L. EWING, Appellant, v. C. L. HOBLITZELLE, Respondent.

### May 13, 1885.

1. ELECTIONS — LEGISLATIVE POWER — CONSTITUTIONAL LAW — ST. LOUIS— RECORDER OF VOTERS. — The act of March 31, 1883, so far as it gives to a recorder of voters to be appointed by the governor, the power to appoint judges and clerks of election, has no force in the city of St. Louis.

2. —— Such provisions are in conflict with the constitutional provision prohibiting the passage of local and special laws regulating the affairs of, and creating offices in, cities.

3. —— The provisions of section 7, of article 9, of the constitution, do not confer the power to pass such an act, so far as it relates to the city of St. Louis.

4. —— The general assembly can exercise no authority over the city of St. Louis, except that intrusted to it by constitutional exceptions to the general provisions which grant an independent local government to that city.

5. —— An authority to provide for the appointment of judges and clerks of election can not be derived from an authority to provide for the registration of voters.

6. —— The constitutional provision that the city charter shall be "in harmony with, and subject to, the constitution and laws" of the state, does not compel exact conformity to a legislative designation of a particular officer to perform a certain duty.

7. —— The constitutional provision that the general assembly shall have "the same power over the city and county of St. Louis as it has over other cities and counties of the State" confers no power upon the legislature to amend the city charter or to interfere with the constitutional right of the city to govern itself in all municipal affairs so long as its municipal regulations do not infringe rights secured by the constitution and laws of the state.

APPEAL from the St. Louis Circuit Court, THAYER, J. *Reversed and judgment.*

LEVERETT BELL, for the appellant: The act contains two separate and independent subjects, and is hence unconstitutional. — *The State* v. *Persinger*, 76 Mo. 346; Cooley's Const. Lim. (5th ed.) 178; *The People* v.

*Parks*, 58 Cal. 624; *Huber* v. *The People*, 49 N. Y. 132; *Murphy* v. *The State*, 73 Tenn. 373; *The State* v. *Barrett*, 27 Kan. 213; *Antonio* v. *Gould*, 34 Texas, 49; *Stewart* v. *Father Matthew Society*, 41 Mich. 67. It is also a local and special law. — *The State, etc.*, v. *Hermann*, 75 Mo. 340; *Devine* v. *Cook County*, 84 Ill. 590. The legislature has no power to interfere with the local self-government of the city of St. Louis. — *The State* v. *Powers*, 68 Mo. 320; *St. Louis* v. *Sternberg*, 69 Mo. 289; *The State* v. *Walsh*, 69 Mo. 409; *St. Louis* v. *Green*, 70 Mo. 563; *The State* v. *Mayor*, 73 Mo. 435; *St. Louis* v. *Knox*, 74 Mo. 79; Ex parte Hollwedell, 75 Mo. 395; *St. Louis* v. *Richeson*, 76 Mo. 470; *St. Louis* v. *Bircher*, 76 Mo. 431.

Glover & Shepley for the respondent: The state legislature has power over all subjects on which its legislation is not prohibited. — 15 N. Y. 303; 27 Barb. 593; 4 Mich. 244; 5 Mich. 257; 24 N. Y. 497, 504; 2 Park. Cr. 490; 15 La. Ann. 190; 18 Ind. 258; 17 Cal. 547; 17 Pa. St. 119; 19 Pa. St. 260; 52 Pa. St. 477; Cooley's Const. Lim. 1868, pp. 173, 174. Although the constitution of a state may recognize the municipal corporations of an important city by fixing the number of certain officers, and providing for their election, etc., yet this does not make the charter of the city a constitutional charter, conferring powers beyond the control of the legislature. — 15 Md. 376 (1859); 4 Zabr. (24 N. J. L.) 385 (1854); *The People* v. *Draper*, 15 N. Y. 561. The general assembly may modify their franchises, increase or diminish their corporate powers, amend their charters, enlarge or reduce their privileges, or annul their corporate existence, as, in its judgment the general good requires, and irrespective of consent or objections on the part of the inhabitants of the municipality. — 7 Wall. 1; 91 U. S. (1 Otto) 540; 27 Ark. 419; 42 Cal. 541; 51 Ill. 17; 31 *Id.* 58; 24 Iowa, 455, 476; 37 Md. 180; 44 Mo. 504; 52 Mo. 351; 36 N. J. L. 273; 20 N. J. Eq. 360; 2 Brews. 599; 2 Abbott's C. 1879, p. 399.

LEWIS, P. J., delivered the opinion of the court.

The petition shows that the plaintiff is mayor of the city of St. Louis; that the charter of the city was framed and adopted pursuant to the provisions of sections 20 to 29 of article 9 of the state constitution; that it is provided by section 15 of article 2 of said charter that the mayor shall, at least ten days before every election held in the city, appoint four competent persons to act as judges of election, and two persons to act as clerks at each election district, under certain regulations therein prescribed; that such judges and clerks are essential and necessary in conducting an election, and no election can be held in said city without their aid; that among the offices created by the charter is the office of president of the board of assessors; that a vacancy having arisen in that office by the death of the former incumbent, a special election for the purpose of filling the same is ordered, pursuant to the provisions of the charter, to be held on the 23d day of October, 1883, and that the plaintiff, as mayor as aforesaid, is engaged in selecting and appointing the judges and clerks accordingly, as required by the charter. The petition then recites the provisions of an act of the general assembly, entitled "An act to provide for the registration of all voters in cities having a population of more than one hundred thousand inhabitants," etc., approved March 31, 1883, whereby a recorder of voters is to be appointed by the governor, whose powers and duties are to include, among others, the appointment of judges and clerks of elections in such cities. It is averred that the act recited is unconstitutional and void; but that the defendant, nevertheless, having been appointed to and now holding the office of recorder of voters under the same threatens to proceed, under the act, to appoint the judges and clerks for the election mentioned, whereby great confusion, uncertainty, and injury to the public interest will necessarily result. The plaintiff prays that the defendant be enjoined from making the said

appointments, as threatened, and for other proper relief. The defendant demurred to this petition, as not stating facts sufficient to constitute a cause of action, and his demurrer was sustained.

It is contended for the plaintiff that the act of March 31, 1883, is in violation of section 53, article 4, of the state constitution, which prohibits the passage of any local or special law " regulating the affairs of counties, cities, townships, wards, or school districts, " * * * or " creating offices, or prescribing the powers and duties of officers in counties, cities, townships, election or school districts," * * * or '" incorporating cities, towns, or villages, or changing their charters." That, notwithstanding its disguise in the habiliments of a general law, in a reference to " all voters in cities having a population of more than one hundred thousand inhabitants," the act is local and special in fact, since it is matter of judicial cognizance that St. Louis is the only city in the state which fits that description.

That such is the true conclusion seems to be settled in *The State ex rel.* v. *Hermann* (75 Mo. 340). After quoting from a number of decisions in other states, whose constitutions contain provisions similar to the one here in view, the court there said : " Taking judicial notice then, as we must, of the official records of the census, we find that St. Louis was the only city in the state possessing one hundred thousand inhabitants at the time of the passage of the act, or which by the usual increase of population could be expected to have that number when the act took effect. This then being ascertained, the city of St. Louis, under the authority cited, is to be regarded as the city intended, as much so as if called by name. But if St. Louis had been thus directly designated no one would have the temerity to contend that such a law could withstand the charge of being a special law." The opinion proceeds to say that the section of the act under discussion " is to be regarded as a special law for

the additional reason that it can by no sort of possibility apply, except as to an existing state of facts," which facts concern certain relations of the particular persons who are to be affected by the provisions of the law. It is then shown that the statute relates to " particular persons of a class," and is, therefore, special. It seems to be for this reason, chiefly, that the court finds the act before it unconstitutional. But as this ground is introduced as additional, and not as only contributory to the fatal force of the first, we must regard the first objection touching the description by population as conclusive against the validity of the law.

In the case just referred to, however, nothing was said about certain constitutional provisions which are here supposed to deny any application of that decision to the present case. A general inhibition against the passage of special laws must yield to a special authority given in the same instrument, to pass special laws of a particular kind. *The State ex rel.* v. *Shields*, 4 Mo. App. 259. It is argued that such a special authority, applicable to the present case, may be found in section 7, article 9, of our state constitution, which reads thus: "The general assembly shall provide, by general laws, for the organization and classification of cities and towns. The number of such classes shall not exceed four; and the power of each class shall be defined by general laws, so that all such municipal corporations of the same class shall possess the same powers and be subject to the same restrictions. The general assembly shall also make provisions, by general law, whereby any city, town, or village, existing by virtue of any special or local law, may elect, to become subject to, and be governed by, the general laws relating to such corporations." From this it is argued that the general assembly may pass laws which shall be applicable to any one class only of such cities, whether that class may contain but one city or a dozen. That the legisla-

ture, acting under this authority, has (Rev. Stats., sect. 4380) declared that "all cities and towns in this state containing one hundred thousand inhabitants or more shall be cities of the first class." That the reference in the act under consideration to "cities having a population of more than one hundred thousand in-inhabitants" is, in effect, a description of cities of the first class, and the legislation is, therefore, competent, even if there be only one such city in the state. The argument is more plausible than sound. It is clear that neither the constitutional provision nor the legislation under it can be applied to the city of St. Louis. The giving of an election to "any city * * * existing by virtue of any special or local law," whether it will come under or stand aloof from the proposed regulations, is conclusive that, until such election be made, all such cities will remain independent of the provisions. A different interpretation would wholly supersede the existing charter of St. Louis, as adopted by the freeholders, and substitute for the city's government the whole of Revised Statutes (ch. 89, art. II.), relating to cities of the first class. No one, so far as we are aware, has ever supposed such a substitution possible.

Another constitutional provision to which our attention is called in this connection is section 5 of article 8: "The general assembly shall provide, by law, for the registration of all voters in cities and counties having a population of more than one hundred thousand inhabitants." * * * It is a sufficient answer to the point made upon this provision that the registration of persons who are to vote at an election is one thing, while the appointment of judges and clerks for the same election is another and different thing. The two acts are distinct and severable. One may be performed by one officer and the other by a different officer. If the legislature had passed an act directing what officer should appoint the judges and clerks of an election, and nothing more, it would never be pretended that this was

done in pursuance of a requirement to provide for the registration of voters. How, then, can it be said to rest upon the same requirement in this instance, merely because it is coupled with something else? It is needless to inquire whether the two functions are germane to each other, so that a reference to one in the title of an act will give sufficient notice of a provision for the other. That has nothing to do with the question. The act to be done must be something more than germane to the subject-matter of the power granted. It must be clearly implied in the power itself. That the general assembly did not understand the power of appointing judges and clerks to be included in the power to register the voters is distinctly manifest in the care with which the law-maker expressly superadded the one to the other. There is no escaping the conclusion that an authority in the general assembly to provide for the appointment of judges and clerks of election can not be derived from an authority to provide for the registration of voters.

The general effect of the two special constitutional provisions above noted is analogous with that of sections 1 and 10 of article X, as shown in *City* v. *Sternberg* (69 Mo. 289), and *City* v. *Bircher* (76 Mo. 431). The language of these sections appears to limit the exercise of the taxing power by municipal corporations within such authority as shall be conferred on them for that purpose by the general assembly. It was argued thence that inasmuch as the general assemby had given to the city of St. Louis no authority to impose a license tax, the power did not exist. But, in the first case, Judge Norton said : " This argument, we think, is unsound in ignoring the fact that the constitution containing the provisions on which the argument is based also contains a provision which expressly designates a particular corporation, viz., the city of St. Louis, and declares that it may adopt a charter, an act of incorporation for its own government." In the second case, Judge Henry said : " The municipal corporations mentioned in section 1, article

X, which derive their authority to levy taxes from legislative grant, are those which derive their existence from legislative enactment, and that embraces at present all municipal corporations in the state, except the city of St. Louis." It is held in each case that the city of St. Louis derives its taxation power from the constitution itself, through the charter framed by the freeholders, and that no grant was needed from the general assembly. Here are satisfactory recognitions of the plain truth, that the comprehensive grants to the general assembly of authority over the charters of municipal corporations, as such, have no legitimate application to the St. Louis charter, whose existence, functions, and attributes are of constitutional creation, through an agency apart from the legislative power. Of course, this is to be understood with such qualifications as may appear in special provisions of the constitution.

We find, therefore, that the unconstitutionality of the legislative attempt to provide for the appointment of judges and clerks of elections in cities having a population of more than one hundred thousand inhabitants, *i.e.*, in the city of St. Louis, stands unredeemed by any special constitutional authorization applicable to the case.

Another question of serious import is involved in the present controversy, and likely to a rise in future litigation, growing out of the peculiar relations which exist between the government of the city of St. Louis and the general law-making power of the state. Thus: In what cases and to what extent may the general assembly annul, repeal, or modify any part of the charter framed by the board of freeholders and accepted by the people of the city of St. Louis in conformity with the authorization given by the constitution of the state? In view of the conclusion already reached, we might here waive the consideration of this question, but for the earnestness and ability with which it is pressed upon our attention from both sides, in the admirable briefs of counsel.

The methods which gave being to the present organic law of the city of St. Louis are familiarly known to most persons, but a brief synopsis of them here may not be out of place.

Section 20, article IX., of our state constitution, provides for an election to be held by the qualified voters of the city and county of St. Louis " of a board of thirteen freeholders of such city or county, whose duty shall be to propose a scheme for the enlargement and definition of the boundaries of the city, the reorganization of the government of the county, the adjustment of the relations between the city thus enlarged and the residue of St. Louis County and the government of the city thus enlarged by a charter," etc. It is then provided that such scheme shall be submitted " to the qualified voters of the whole county and such charter to the qualified voters of the city so enlarged,    *    *    *    and if a majority of such qualified voters voting at such election shall ratify such scheme and charter, then such scheme shall become the organic law of the county and city and such charter the organic law of the city, and at the end of sixty days thereafter shall take the place of and supersede the charter of St. Louis and all amendments thereof and all special laws relating to St. Louis County inconsistent with such scheme."

Section 21 provides that copies of the scheme and charter shall be authenticated as directed and deposited and recorded in designated offices, " and thereafter all courts shall take judicial notice thereof."

Section 22 provides that the charter " may be amended at intervals of not less than two years, by proposals therefor, submitted by the law-making authorities of the city to the qualified voters thereof at a general or special election    *    *    *    and accepted by at least three-fifths of the qualified voters voting thereat."

Following a ratification of the work of the freeholders, at an election held on August 23, 1876, the other necessary

steps were taken, and it was afterwards judicially determined that the new organic law went into constitutional operation sixty days after that election. *The State ex rel.*, v. *Sutton*, 3 Mo. App. 388.

Let us first consider the nature of the powers thus vested in the new municipal creation, without regarding for the time being the limitations annexed to them by the creating hand. In this aspect, the new city government, as compared with other constitutional agencies, is literally *imperium in imperio.* It is an immediate representative of the supreme power — the sovereign people of the state. It no more owes allegiance or duty to the general assembly than the general assembly does to the city government. The two are co-equal products of the same creative energy, which has not placed either one above the other. Even the right to change a single provision of the new charter is expressly given to the qualified voters within the limits of the municipality, and so the idea of any such control in the general assembly is conspicuously ignored. But we look further, and find that the constitution has attached certain restraints and limitations to the authority of this new agency. It is none the less true, however, that a literal interpretation of these restraints and limitations will embody the sum of all curtailments of the general grant. In other words, so far as the general assembly is concerned, that body can exercise no power over the new municipal creation, which is not expressly entrusted to it in the terms of some constitutional exception out of the fundamental independence of the local autonomy. In this respect, the relations existing between these two governmental agencies differ widely from those between the legislature and ordinary municipal corporations. As to the latter, the legislature may exercise 'any and all powers over the local government, except such as are expressly forbidden.

Let us now turn to the expressed limitations upon a power granted by the people of the entire state to the

qualified voters of a particular district.    We need not refer
to specific directions touching the form of the city govern-
ment and its several departments, or concerning the adjust-
ment of the relations between the old city and county,
since they have no influence upon the question before us.
The first limitation, repeated from section 20, is thus ex-
pressed in section 23 : " Such charter and amendments
shall always be in harmony with, and subject to the consti-
tution and laws of Missouri."    *    *    *

Harmony is not identity.    An agreement between two
systems in the fundamental principles of their action upon
the rights of persons and property, and in the administra-
tion of justice, will satisfy the most exacting demand for
harmony.    The constitutions of all the several states are
understood to be in harmony with the federal constitution.
And yet no two of them are alike in all their details, and
not one is a copy of the common superior.  There is nothing
in this limitation which should subject the city charter to
an exact conformity with a legislative designation of the
particular officer who is to perform a certain duty.    Har-
mony with the general laws may require that a particular
duty, as the appointing of judges and clerks of elections,
shall be discharged by some one.    But beyond this, all is
mere detail in structure or machinery, which the constitu-
tion wisely left to the framers of the charter.

The next and most important limitation is contained in
section 25 :  " Notwithstanding the provisions of this arti-
cle, the general assembly shall have the same power over
the city and county of St. Louis that it has over other
cities and counties of this State."    The learned counsel for
defendant here propound an inquiry and fit it with an
answer which asserts the largest possible power in the gen-
eral assembly over the organic law of the city of St. Louis.
" And what is the power of the general assembly over
' other cities of the State? '    To make, break, and mend
their charters at pleasure, provided it is done by a general

law." Hence, the same sort of power may be exercised over the charter of St. Louis. We confess a difficulty in accepting this deduction.

Let it be admitted that a law concerning municipal charters may be so framed as to encounter no constitutional objection on the ground that it applies specially and exclusively to the city of St. Louis. If such a law may, on general principles, repeal any one provision of the present charter, it may repeal another, and still another, and, in fact, all of them. In short, it may abolish the whole charter and substitute a different one. If this may be done to-day, it might have been done the day after the charter went into effect. It might have annulled the scheme of separation and have re-established the old relations between the city and county. Nor is this all. A power to abolish logically implies the right of anticipatory prohibition. The general assembly, by such a law, could have forbidden the adoption of the scheme and charter, after the framing of them by the board of freeholders. The same authority could have prescribed in advance the exact form and structure of the scheme and charter to be promulged by the freeholders, with a notice that any different form or structure would be annulled by legislative action. All such powers, and others yet more comprehensive, are unquestionably annexed to the authority of the general assembly over the charters of other cities of the state, and are not the less so because they must be exercised through the medium of general laws. But is it conceivable that the framers of the constitution intended the possibility of such a swallowing up of the St. Louis autonomy, for whose advent they were making elaborate and exceptional preparation? Our supreme court tells us, in *City* v. *Sternberg* (69 Mo. 297), that the constitutional purpose is manifested throughout the sections, in that relation, that the city of St. Louis might " have the right as a municipality to govern itself, provided its government should be in subordination to and consistent

with the constitution and laws of the state." Does the constitution intend with one hand to build up, and with the other to destroy? It is no answer to say that the general assembly, although having the right thus to demolish the constitutional fabric of local self-government, would never be likely to exercise it. The question is as to the extent of power conferred, and is not to be solved by conjectural possibilities of the use that might or might not be made of it. Nor will it avail anything to suggest a contemplated power in the general assembly, for the purpose of keeping the charter provisions within the bounds of consistency with the contsitution and laws of the state. Any question of conflict between a charter provision and the state laws would belong to the judicial and not to the legislative department.

What, then, are the true meaning and application of section 25? The first step in this inquiry would seem to be a recognition of the fact that there may be some sort of difference between the right or power of legislation over a city and a power over its charter. The constitution does not say in so many words that the general assembly shall have any power over the charter of the city, to be framed by the freeholders. If the power over the city of St. Louis, reserved to the general assembly, be regarded as of territorial rather than of organic application, there will be less difficulty in reconciling the result with the manifest constitutional purposes, as repeatedly recognized by our supreme court.

The right of local self-government, so clearly traced by Judge Norton in *City* v. *Sternberg* (*supra*), is as clearly reaffirmed by Judge Henry, in *The State ex rel.* v. *Walsh* (69 Mo. 411). Having compared, for a certain purpose, "all the primary political subdivisions of the state" with "the political entity created by the special provisions relating to the city of St. Louis," the learned jurist says of the state constitution: " The general purpose of its framers, how-

ever, so far as the political *status* of the city of St. Louis is concerned, will, on a careful examination of those clauses bearing directly upon the separation of the city from the county, be found to be to divest the city of all county government, and to withdraw it from the operation of many of the acts of the general assembly in force in the county of St. Louis at the time of such separation.    Of course, the general laws of the state relating to persons and property, and regulating the administration of justice, remained in force after the separation as before, because the city still remained a part of the state.    But all special enactments of the general assembly relating to St. Louis county which were inconsistent with the new order of things were, by the terms of the constitution itself, repealed.    So, also, the acts of the general assembly relating to the city of St. Louis, other than the charter and its amendments, which were superseded by the scheme and charter, continued in force in the city of St. Louis notwithstanding the separation." Here we find the line sharply drawn betweeen " the general laws of the state relating to persons and property, and regulating the administration of justice," together with " acts of the general assembly relating to the city of St. Louis, other than the charter and its amendments," on the one hand, and the special enactments relating to the city and county, which were "inconsistent with the new order of things," on the other.    The first mentioned classes of laws remained in force, thus preserving in the general assembly the " same power over the city " that it has over other " cities of this state."    Those in the second class, which concerned purely the charter machinery of the municipality, were repealed by the constitution itself, by way of a consistent introduction of " the new order of things."    There is, in our view, no reasonable method of harmonizing the reservation contained in section 25, above quoted, with the peculiar constitutional franchise of self-government bestowed on the inhabitants of the city of St.

Louis, otherwise than by accepting the division of powers identified with the introduction of the new system, as the model of that which was to follow it in perpetuity. By this means, "the general laws of the state relating to persons and property, and regulating the administration of justice," however they may be modified from time to time, will always prevail over the city of St. Louis, as elsewhere in the state. The citizen from any other city, county, or precinct will find here the same laws controlling his rights of person and property, and the same forms in their administration as those of his own home, wherever it may be in Missouri. At the same time, the local machinery whereby the needs of a large city are served in matters of finance, street improvement, water, light, health, and other subjects connected with the public convenience or comfort will remain in the exclusive control of those whose interests exclusively it affects and by whom only it may be amended or modified in any of its parts, in the manner specifically prescribed by the constitution, without dictation or interference from any other authority. But if this local machinery may be altered and remodelled in any or all of its parts whenever this may suit the pleasure of the general assembly, the "manifest purpose" of the constitution in bestowing upon the city "the right as a municipality to govern itself" will be thrust out of view for a delusion and a sham. Such a result is not demanded by the harmonies of our constitution, and was never contemplated by its framers.

A municipal regulation can never come in conflict with the constitution and laws of the state unless by its infraction of some right secured by those laws. If a charter provision or amendment should be so framed as thus to antagonize the general law the courts would be prompt to declare it void, and thus apply the true and only corrective. There is, therefore, no need of legislative supervision, nor any reason why a subjection of the charter to the constitution and laws should be construed as authorizing a domination

of local regulations by the general assembly. Especially is this true of an organic law which abounds in restrictions upon local and special legislation.

An essential function of municipal government is the creation of local offices, with a definition of the duties to be performed respectively by the several incumbents. The appointing of judges and clerks of election at every precinct is a duty enjoined by the general law. But the designation of the particular officer who is to perform that duty is as purely a matter of local concern as the selection of the custodian of the public funds, or of any other officer who is to discharge executive duties. The constitution makes special provision for a designation of the officer who is to register the voters, giving to the general assembly complete authority over every thing necessary to accomplish the end in view. But it confers upon that body no more right to say who shall appoint the judges and clerks, than it does to declare what officer or person shall be the chief executive of the city.

The judgment of the circuit court will be reversed. The time has long since passed when the injunction prayed for could have had an operative effect. It would be useless, therefore, to remand the cause. But the parties are entitled to a final determination of their rights in the premises, and so a general judgment will be entered here in favor of the plaintiff. All the judges concur.