JOHN C. BROWN and J. W. CHILTON, Appellants,
v. JOHN E. MARSHALL and MARTIN L. CLARDY.

Division One, March 29, 1912.

1. **PROBATE COURT: Term: Alteration of Time.** Under the Laws of 1877, page 230, section 7, and the Revised Statutes of 1855, page 1601, section 9, the probate court of St. Louis county, at the June term, 1877, and on July 28th of that year; had express authority to make and enter of record an order changing the time for holding its stated terms, and to fix upon the second Monday in September and the first Mondays of December, March and June as the times for the beginning of the regular terms of the court.

2. ————: ————: ————: **Before Act of 1877 Went Into Effect.** Even if the order changing the times for the beginning of the terms of the probate court of St. Louis county, made on July 28, 1877, was made one day prior to the time the Act of 1877 went into effect, the Act of 1855 (R. S. 1855, p. 1601, sec. 9) was then in force, in almost the same words, and was ample authority for the order, since the Act of 1877 did not purport to repeal any of the Act of 1855 except "all acts and parts of acts inconsistent with this act," and there is nothing inconsistent between the two, and besides the Act of 1877 was but a continuation of the Act of 1855.

3. ————: ————: ————: ————: **Statutory Construction: Continuation of Existing Act.** A subsequent act repealing and reenacting .at the same ·time a preexisting act is but a con-

Brown v. Marshall.

tinuation of the latter, and the law dates from the passage of the first act and not from the date of the latter.

4. ———: ———: ———: By Probate Court of County of Terms of City Court: Separation. The separation of the city of St. Louis from the county of St. Louis in 1876 did not affect the orgination, jurisdiction or location of the probate court of St. Louis county then existing. The probate court of St. Louis county had authority at its July term, 1877, to change the time for beginning the regular terms of the probate court of St. Louis city. That was not an attempt by one court to make an order changing the terms of another court. Prior to the division of the county into the city and county of St. Louis, the county seat, courts, offices and public buildings of the county of St. Louis were in the city of St. Louis, and those courts continued and remained in the city after the segregation of the present county; and the change from the probate court of the county of St. Louis to the probate court of the city of St. Louis was a change only in name, with the single exception that, after the Act of April, 1877, creating a probate court for the segregated county of St. Louis, the territorial jurisdiction of the city court was *pro tanto* curtailed. In all other respects it continued with the same officers, the same habitat and the same jurisdiction.

5. ADMINISTRATOR'S SALE: Of Real Estate to Pay Debts: Disapproved: Renewal of Order at Subsequent Term. Where a valid order to sell the real estate to pay decedent's debts has, after proper statutory notice to the heirs and parties interested has been given, been made, and the sale made in pursuance thereof has been disapproved because of the inadequacy of the price obtained, it is not necessary to the validity of a renewal order to sell that such renewal order be made at the same term, or that the heirs and interested parties be given further notice before the renewal order is made at a subsequent term. Whenever a party is duly summoned into court for a particular purpose he remains there until that purpose is finally accomplished or disposed of, or until he is otherwise discharged according to law.

Appeal from St. Louis City Circuit Court.—*Hon. C. C. Allen* and *Hon. Moses N. Sale,* Judges.

AFFIRMED.

*Wilson Cramer* for appellants.

(1) The order of publication by which the probate court of St. Louis city sought to obtain jurisdiction of the heirs of Lewis V. Bogy is void because it

was not made returnable to any time when the law required said court to be held, or provided that it might be held. The Act of 1877 definitely fixed the time for holding the terms of said court upon the second Mondays in February, May, August and November; whereas the order of publication was made returnable to the second Monday in September, 1878. Sec. 34, art. 6, Constitution; Laws 1877, p. 230, sec. 7; R. S. 1879, sec. 148; Holladay v. Cooper, 3 Mo. 156, 203; Haws v. Clark, 37 Iowa, 355; Wade on Law of Notice, sec. 1030. Such order of publication should have been made returnable on the first day of the next regular term of said court, as fixed by law, to-wit, the second Monday in August (or November), 1878. Sec. 34, art. 6, Constitution; Sec. 148, R. S. 1879. (2) The order of the probate court of St. Louis county changing the time for holding its terms of court did not authorize nor purport to authorize the probate court of the city of St. Louis to hold its terms of court at a time not authorized by law. Independent tribunals have no authority to manage the affairs of each other. Sec. 1, p. 1599, 2 R. S. 1855; Sec. 7, p. 230, Laws 1877. (3) The order of publication by which the probate court of St. Louis city sought to obtain jurisdiction of the heirs of Lewis V. Bogy was void also because not made at any regular, special or adjourned term of said court, and because it was made at a time when the said court was not, and could not be, in lawful session. Sec. 34, art. 6, Constitution; Laws 1877, sec. 7, p. 230. (4) The laws of 1877, creating the probate court of the city of St. Louis, did not take effect until July 29, 1877 (ninety days after the adjournment of the 29th General Assembly on April 30, 1877); therefore the order made by the probate court of St. Louis county on July 28, 1877, could not by any possibility have the effect to change the times as fixed by law for holding the terms of the probate court of St. Louis city, and did not authorize the probate court of St.

Louis city to hold its terms of court at a date differing from that fixed by law.   (5)   In a proceeding to sell the lands of a decedent to pay his debts notice to his heirs is a jurisdictional prerequisite, and an order of sale of lands made without jurisdiction of the heirs is void, and as clearly "without due process of law" as are the judgments of any other courts of record rendered without jurisdiction of the defendants therein.   Valle v. Fleming, 19 Mo. 454; Young v. Downey, 145 Mo. 258, 332; Hutchinson v. Shelly, 133 Mo. 412.   And such judgment may be overthrown in collateral attack by introducing return or notice showing invalid service.   Davis v. Montgomery, 205 Mo. 271; Feurt v. Caster, 174 Mo. 290; Stark v. Kirchgraber, 186 Mo. 646; Des Loge v. Tucker, 196 Mo. 601; Kelly v. Murdough, 184 Mo. 377.   (6)   Constructive service must always be had according to the method pointed out by statute, and is strictly construed. Wade on Law of Notice, sec. 1030; Young v. Downey, 150 Mo. 326; Harness v. Cravens, 126 Mo. 252; Lumber Co. v. McCabe, 220 Mo. 177; Williams v. Monroe, 125 Mo. 574; Ohlman v. Mill Co., 222 Mo. 62.   (7)   The probate court of the city of St. Louis, having no authority of law to hold a term of court on the second Monday of September, 1878, at which time the original order of sale was made under which respondents claim title, and having no authority to hold a term of court on the second Monday in September, 1881, at which time the renewed order of sale was made, the said orders of sale, made at said dates, were *coram non judice* and utterly void; and the administrator's deeds made thereunder are likewise absolute nullities.   State ex rel. v. Ross, 118 Mo. 23; Williams v. Monroe, 125 Mo. 581; Doss v. Waggoner, 3 Tex. 576; Brumley v. State, 20 Ark. 78; Garlick v. Dunn, 42 Ala. 404; Wightman v. Karsner, 20 Ala. 446; Norwood v. Kenfield, 34 Cal. 329; Francis v. Wells, 4 Colo. 274; Austin v. Searing, 16 N. Y. 112; Kleber's Void Judicial Sales,

sec. 142, p. 139; 8 Am. & Eng. Ency. Law, 24, 29; 11 Cyc. 728, 727; Robinson v. Ferguson, 78 Ill. 528. (8) The first sale of the lands in controversy by the administrator, having been disapproved by the probate court, the order to sell could have been renewed by the probate court at the same term at which the same was disapproved while the heirs were presumed by law to be present in court, but as this was not done, and as the heirs of Bogy did not appear in court and did not ratify the proceedings in any manner, the renewed order of sale, upon which respondents' claim is based, made nearly a year after the sale was disapproved, was void for want of jurisdiction. Sec. 168, R. S. 1879; George v. Middough, 62 Mo. 549; State v. Walbridge, 119 Mo. 394; Koch v. Hawkins, 40 Mo. App. 680; Ault v. Bradley, 191 Mo. 729.

*N. A. Mozley* and *Charles W. Bates* for respondents.

(1) The separation of the city and county of St. Louis in 1876—the division of the old county of St. Louis—did not affect the organization or jurisdiction or location of the probate court of the county of St. Louis established in St. Louis. Constitution, art. 9, secs. 20, 23, 24; Constitution, art. 6, sec. 34; Constitution, art. 14, sec. 5; Schedule, sec. 3; R. S. 1855, p. 1599, being sec. 1, Act of Dec. 2, 1855; Scheme, secs. 1, 3, 5, 10; Henderson v. Koenig, 168 Mo. 356; Ex parte Buckner, 9 Mo. App. 540; State ex rel. v. Finn, 4 Mo. App. 347; State ex rel. v. Mason, 4 Mo. App. 377; State ex rel. v. Finn, 8 Mo. App. 341; State ex rel. v. Walsh, 69 Mo. 408; State ex rel. v. Laughlin, 75 Mo. 147; Eicherlmann v. Weiss, 7 Mo. App. 87; Cunningham v. St. Louis, 96 Mo. 53; Babcock v. Hahn, 175 Mo. 136; State ex rel. v. Railroad, 195 Mo. 228. (2) The probate court of the old county of St. Louis, located in the city of St. Louis since 1841, was not abolished by the act of 1877, nor was it moved. That

act simply created a new court for the new county of St. Louis, as distinguished from the city of St. Louis. Constitution, art. 6, sec. 34; Constitution, art. 9, sec. 24; Constitution, art. 14, sec. 5; Schedule, sec. 3; Laws 1877, p. 229, sec. 18; State ex rel. v. Gammon, 73 Mo. 421; Babcock v. Hahn, 175 Mo. 136; State ex rel. v. Laughlin, 75 Mo. 147; Henderson v. Koenig, 168 Mo. 356; Eicherlmann v. Weiss, 7 Mo. App. 87; State ex rel. v. Finn, 8 Mo. App. 341; State ex rel. v. Walsh, 69 Mo. 408; Cunningham v. St. Louis, 96 Mo. 53. (3) The terms of the probate court, fixed by order of the court, are legal terms of court. The probate court had the power, under the statutes, to change the time for the terms of court from the dates fixed by the statute to those fixed by the court to meet the convenience of the court and the public. Rhodes v. Bell, 230 Mo. 138; Overton v. Johnson, 17 Mo. 451. (4) The provisions of the act of 1877, relating to terms of probate courts, did not repeal the same provisions of the statutes as they then existed, but were continuations of such provisions and did not invalidate the action of the court in fixing its terms. State ex rel. v. Mason, 153 Mo. 23; State ex rel. v. Court, 53 Mo. 128; Smith v. People, 47 N. Y. 330. (5) The probate court having acquired jurisdiction to make the original order of sale, the renewal order of sale without further notice and at any subsequent term was valid. Rhodes v. Bell, 230 Mo. 138; Rogers v. Johnson, 125 Mo. 214; Sims v. Gray, 66 Mo. 616; Stowe v. Bank, 123 Mo. 672; Greffett v. Williams, 114 Mo. 181. (6) Judge Woerner was elected at the general election in 1876 under the act of 1855 for a term of six years and was, by the constitutional provisions and by the scheme of separation of the city and county of St. Louis and by the act of 1877, expressly continued in the office of judge of the probate court, to which he was then elected to the expiration of his six-year term. Constitution, art. 9, sec. 24; Constitution, art. 14,

sec. 5; Act of 1877, sec. 18; State ex rel. v. Gammon, 73 Mo. 421. (7) The acts of the probate court are entitled to the same presumptions of validity as those of any other court of record or of any court of general jurisdiction. Covington v. Chamblin, 156 Mo. 574; Camden v. Plain, 91 Mo. 117; Bray v. Adams, 114 Mo. 486; Wolf v. Robinson, 20 Mo. 459; Nolan v. Barrett, 122 Mo. 181; Rugle v. Webster, 55 Mo. 246; Hughes v. McDavitt, 102 Mo. 77; Price v. Real Estate Ass'n, 101 Mo. 114; Woerner on Am. Law of Administration, secs. 144, 145; Rogers v. Johnson, 125 Mo. 215.

*Wilson Cramer* for appellant in reply.

(1) The city of St. Louis was a new political subdivision of the State carved out of St. Louis county, created by the adoption of the scheme and charter in 1876, and the residue of the county remained a legal county of the State under the name of the county of St. Louis. Sec. 23, art. 9, Constitution of 1875; State ex rel. v. Walsh, 69 Mo. 408; State ex rel. v. Mason, 4 Mo. App. 377; People v. Morrell, 21 Wend. (N. Y.) 563; State ex rel. v. Walker, 17 Ohio, 135; State ex rel. v. Choate, 11 Ohio, 511; Mauck v. Lock, 70 Iowa, 266; School Dist. v. Wolf, 20 L. R. A. 358. (2) The probate court of St. Louis city was not a continuation of the probate court of St. Louis county, but was a new court created by the act of 1877. State ex rel. v. Walsh, 69 Mo. 408; People v. Morrell, 21 Wend. (N. Y.) 563; Sec. 23, art. 9, Constitution of 1875; Sec. 1, Laws 1877, p. 229; County v. Albany, 92 U. S. 307. (3) Sec. 18, Laws 1877, p. 231, providing that all probate judges and ex-officio probate judges should continue in office and discharge all duties of probate judges until the expiration of the terms for which they were elected, taken in its most favorable aspect to respondents' contention, could be made to apply only to offices in existence at the time such act was passed, and could not be made to apply to offices

not theretofore in existence. References as under points 1 and 2. (4) Said Sec. 18, Laws 1877, did not authorize a probate judge thereby continued in a pre-existing office to usurp or perform the duties of a different office, and said act could give to Judge Woerner, as a *de facto* judge of the court, whose functions he had assumed by usurpation, no greater powers than the law conferred upon the office, or would have conferred upon any lawful incumbent thereof. See authorities under points 1 and 2. (5) The constitutional provision, sec. 24 of art. 9, providing that courts of record then in existence were to continue to exercise their territorial jurisdictions as then exercised, "until otherwise provided by law," was fully met, satisfied and ended by the act of 1877 creating a probate court for the city of St. Louis. Laws 1877, sec. 1, p. 229; State ex rel. v. McMillan, 108 Mo. 153. (6) Neither courts nor individuals have the power to take any action looking either to the annulment or putting into effect the provisions of a statute before the date that such statute takes effect as a completed law. Lewis & Sutherland's Stat. Const., sec. 182, p. 323; St. Louis v. Alexander, 23 Mo. 520; Keane v. Cushing, 15 Mo. App. 96; State v. Field, 17 Mo. 529; State v. Railroad, 31 Ark. 701; People v. McDougle, 6 Cal. 673. (7) The appellate courts will take judicial notice of the dates when regular terms of inferior courts are held, when and only when such terms are held upon dates fixed by law, which is nothing more than the taking of judicial notice of a public law. Hadley v. Bernero, 97 Mo. App. 319; Harwood v. Toms, 130 Mo. 225; Wade on Law of Notice, sec. 1414.

WOODSON, J.—This suit was instituted March 18, 1907, in the circuit court of Stoddard county, by the plaintiffs against the defendants, under section 650, Revised Statutes 1899, now section 2535, Revised Statutes 1909, to ascertain and determine the interests

of and to quiet the title of the parties to some 4400 acres of land situated in said county, particularly described in the pleadings. Afterwards a change of venue was awarded to the circuit court of the City of St. Louis, where a trial was had, which resulted in a judgment in favor of the defendants, from which the plaintiffs duly appealed to this court.

It was agreed that Lewis V. Bogy was the common source of title. The plaintiffs claim title to the lands in controversy by regular quitclaim deeds from his heirs dated September 18, 1905, and the defendants claim title thereto. through mesne conveyances from said Bogy under an administrator's deed made and executed by the administrator of his estate, in pursuance to orders of the probate court of St. Louis county, now the city of St. Louis, dated March 11, 1882.

Since no question is raised as to the sufficiency of the pleadings they will be put aside without further notice, excepting we will here state that they are sufficient to embrace every question which will be discussed in this opinion.

As to the facts: Lewis V. Bogy, the common source of title, resided in the city of St. Louis, and died there intestate in the year of 1877, owning the land in controversy, as well as other lands in Stoddard county; leaving surviving him his widow, Pelagie Bogy, Joseph Bogy, his son, and Josephine Noonan, his daughter.

The heirs of Lewis V. Bogy, having waived their right to administer upon his estate, the probate court appointed Samuel N. Holliday administrator thereof. He duly qualified as such and entered upon the discharge of his duties as such.

The assets of the estate were duly inventoried and appraised by the administrator, as required by law, and claims to the amount of about $200,000 were duly allowed against it, which showed that the estate was

hopelessly insolvent, the indebtedness exceeding the assets by about $185,000.

The St. Louis County Probate Court opened its June term, 1877, at the city of St. Louis on the first Monday, being the 4th day of June, of that year, and there were present Honorable J. Gabriel Woerner, judge; William E. Wagner, clerk; and Isaac N. Mason, marshal. During the same term and on the 28th day of July, 1877, the following order was made and entered of record by the court:

"It is ordered by the court that hereafter the regular terms thereof shall begin on the second Monday of September, and on the first Mondays of December, March and June of each year, instead of the time now provided by law, and that notice of such change of time be published in each of the daily newspapers published in the city of St. Louis, and also by posting such notice in some conspicuous place in the clerk's office and court room.

"J. G. WOERNER, Judge."

"The next record referred to is that of the probate court of the city of St. Louis, opening its September (1877) term, whereby it is shown that the September (1877) term was begun and held in the city of St. Louis on the second Monday, being the 10th day, of September, 1877, and that there were present the same officers of the court before mentioned.

"The next record in order of time is the declination to administer and request for the appointment of Samuel N. Holliday as administrator of the estate of Lewis V. Bogy. This declination and request was dated October 23, 1877, and was signed by Pelagie Bogy, widow; Joseph Bogy, son; and Josephine Noonan, daughter, and Thos. S. Noonan, her husband, designating themselves in the body as widow and heirs-at-law of Lewis V. Bogy, deceased.

"At the June term, 1878, of the probate court of the city of St. Louis, the administrator, Samuel N.

Holliday, filed a petition asking for an order of sale of the lands of the estate of Lewis V. Bogy, deceased, or so much as may be necessary to pay the debts of the estate of the deceased, stating that the personalty was not sufficient for that purpose, and describing the lands of the estate, including the land involved in this controversy, and was accompanied by the lists and inventories previously mentioned."

The order of publication is as follows (formal parts omitted):

"In the probate court for the city of St. Louis, June term, 1878. Saturday, July 20, A. D. 1878.

"ORDER OF PUBLICATION.

"ESTATE OF LOUIS V. BOGY.

"Now at this day comes Samuel N. Holliday, administrator of the estate of Lewis V. Bogy, deceased, and presents to the court his petition praying for an order for the sale of so much of the real estate of said deceased as will pay and satisfy the remaining debts due by said estate, and yet unpaid for want of sufficient assets, accompanied by the accounts, lists and inventories required by law in such case; on examination whereof, it is ordered that all persons interested in the estate of said deceased be notified that application, as aforesaid, has been made, and that unless the contrary be shown on or before the first day of the next term of this court, to be begun and held at the city of St. Louis, within and for the city of St. Louis, on the second Monday of September, next, an order will be made for the sale of the whole, or so much of the real estate of said deceased as will be sufficient for the payment of said debts; and it is further ordered that a copy hereof be published in some newspaper printed in the city of St. Louis, aforesaid, for four weeks before the next term."

The original order of sale was duly made at the September term, 1878, of the probate court of the city

of St. Louis, on the 26th day of October, 1878, and finds due publication of the notice to those interested in the estate upon the order of the last June term of said court, and finds not sufficient personal assets to pay the debts of said estate; describes the lands, directs the appraisement before sale, and directs the sale thereof or so much of them as necessary to pay the debts, at private sale.

At the September term, 1880, and on the 18th day of October, 1880, the administrator petitioned the court for a renewal order of sale, stating that he had been unable to make any sales under the order theretofore made. Upon this petition, and on the same day, the court made a renewal order of sale, at public or private sale, describing the land.

At the December term, 1880, of the court, and on the 6th day of December, 1880, the administrator reported the sale of lands of said estate, stating the lands did not sell for their value and that to confirm the sales would be disadvantageous to the estate. At the said December term, and on the 18th day of December, 1880, the probate court disapproved of the sales so reported by the administrator.

At the September term, 1881, and on the 20th day of October of that year, the administrator petitioned the court for a renewed order of sale, at public or private sale, of the lands belonging to the estate of Lewis V. Bogy, deceased. At said term and on October 20, 1881, the court made a renewal order of sale of the lands of said estate, finding in said order that the prior order of the September term, 1880, had not been executed. This order correctly describes the property, and is in the usual form.

The records further show that the administrator made annual reports at the December term in the year 1881 and 1882.

At the March term, 1882, of the probate court, and on March 6, 1882, the administrator made a report

to the court of his sales, describing the land sold, among which was the land in controversy, reciting the names of the purchasers and the prices obtained for the land. He further recites that the sales were made at public auction, after the same had been duly appraised, and after the appraisement, and that the dower interest of the widow was included in the sales, she having made a quitclaim deed.

At the same term, and on March 11, 1882, the court approved the sales of the lands, including the land in controversy, to those under whom respondents claim, and recites that the sale was made under and by virtue of the renewed order of sale, made at the September term, 1881, of the court, and directed that the sales made be ratified and confirmed. The order further recites that a commissioner was appointed to ascertain and set out the widow's dower interest in the proceeds of the sales.

At the December term, 1882, and on December 11, 1882, the administrator filed his final settlement.

The final settlement recites the sales of the real estate, giving the names of the purchasers and the amounts, and recites the reception by the administrator of the proceeds of these sales, including the lands in controversy, and showing the payment to the widow of her dower interest in the proceeds of the sale of the lands, showing cash in hand for distribution among creditors, $8886.62; setting out the items of personal estate, other than money, still on hand, face value, $21,550; setting forth the claims allowed against the estate, amounting to $186,914.62. The report states that the personal estate is of little value, consisting mostly of stocks, and asking an order to sell the same.

It shows allowed debts against the estate unpaid to the amount of $82,382.36.

At this December term, 1882, and on the 11th day of December, 1882, the probate court made an order

reciting the filing of the final settlement, duly verified by affidavit, together with the proof of publication of notice given by the administrator, as required by law, of his intention to make such settlement, and found the amount of cash on hand and the par value of other personal property as stated in said settlement, directed the administrator to pay a 4.7 per cent dividend on fifth-class demands, with interest accrued thereon amounting to the sum of $186,914.62, and ordered the administrator to sell for cash at public sale the stocks and claims, being the personal property still remaining on hand, after giving notice, etc., and report his proceedings thereunder to the court at the next March term thereof, to which it is ordered that the final settlement be and is hereby continued.

At the June term, 1883, the administrator filed his report of the sale of the personal property, showing the aggregate of the prices which the personalty brought at the sale, to be twenty-eight dollars and twenty cents, twenty-one dollars of which was stated in the report to be uncollectible by reason of the fact that the item purchased for that amount, being a claim for damages, was not assignable.

At the September term, 1892, and on October 7, 1892, the administrator filed his final settlement and receipts, showing the disbursements, together with proof of publication of notice given by him as required by law and his intention to make such settlement, and the same day the court made an order, finding due publication of notice of said settlement and that the administrator had a balance in his hands, belonging to said estate, of $673.35, and the court further found that more than two years having elapsed since the date of granting letters of administration of said estate, it was ordered that the administrator pay 427-1000 per cent on all demands of the fifth class.

The notice of said final settlement was also of-

fered in evidence, showing due publication of notice to the September term, 1892.

At the December term, 1893, and on January 19, 1894, the court entered an order finding that the administrator had filed in court receipts for the amounts ordered to be paid by him in final settlement of said estate and ordered that he be now finally discharged as such administrator.

Adolph Lackman, a deputy clerk in the probate court, called by appellants, testified that the records of the proceedings of the probate court, of the county of St. Louis, had down to July 28, 1877, are kept in the courthouse of the city of St. Louis.

Respondents and those under whom they claim have paid all the taxes of every kind assessed against the land ever since it was sold by the administrator.

John E. Marshall, one of the respondents, called by the respondents, stated that he bought the lands in controversy about 1902 and paid from one dollar and a half to two dollars per acre, at which time the market value was about one dollar and a half an acre, but which now are worth about fifteen or twenty dollars an acre. The price immediately went up after the Simpson case was decided by the Supreme Court in 1903 (which case decided adversely to the claim of Stoddard county to the lands and in favor of the private ownership); that he took charge of the lands and managed them for himself and Mr. Clardy and assisted in the drainage in that county; was one of the commissioners in the formation of drainage districts, and also sold some of the lands; has paid special drainage assessments upon these lands, which are located in the drainage districts; devoted time to the organization of several drainage districts and was commissioner in some of them and did work about the preliminary matters in relation to the organization of a large drainage district, covering several counties;

has other lands, affected by the Little River Drainage District, which is the drainage district covering several counties; paid his own expenses in attending to these matters. Several ditches drained the lands and made them fit for clearing and cultivation; some of these ditches are not yet completed. After the decision of the Ringen title everybody that owned land down there began to improve it and were convinced that it was feasible to drain that country, proceeded to do so, and the values everywhere began at that time to increase and the people went right on and worked in harmony together.  He received no compensation for serving on the committees in regard to these drainage matters and no allowance was made him.  He, with others, procured the passage of a bill improving upon the Indiana drainage laws for the redeeming of this land, and when that bill was passed they proceeded with the drainage proposition and have been at it ever since.  The drainage taxes run from fifty cents to four dollars an acre according to the benefits.

Counsel for the appellants states in his brief that "the validity or invalidity of the administrator's sales of the land in controversy, and the deeds based on said sales under which respondents claim the land, is the sole and only issue in this appeal."

After a careful consideration of the record and able briefs of counsel filed in the cause, we are of the opinion that the only issue here involved is correctly stated by counsel in the language just quoted.

He goes further, however, and assigns many reasons in support of his contention that said sales and deeds are void, the first being that "the order of publication by which the probate court of St. Louis city sought to obtain jurisdiction of the heirs of Lewis V. Bogy is void, because it was not made returnable to any time when the law required said court to be held or provided that it might be held.  The Session Acts

of 1877 definitely fixed the time for holding the terms of said court upon second Mondays in February, May, August and November; whereas the order of publication was made returnable to the second Monday in September, 1878.''

In support of this contention, counsel for appellants cite section 34, article 6, of the Constitution of Missouri; Laws 1877, section 7, page 230; section 148, Revised Statutes 1879; Holliday v. Cooper, 3 Mo. 286; Haws v. Clark, 37 Iowa, 355; Calkins v. Miller, 55 Neb. 601; Wade on Law of Notice, section 1030.

Said section 34 of article 6 of the Constitution reads as follows: ''Sec. 34. The General Assembly shall establish in every county a probate court, which shall be a court of record, and consist of one judge, who shall be elected. Said court shall have jurisdiction over all matters pertaining to probate business, to granting letters testamentary and of administration, the appointment of guardians and curators of minors and persons of unsound mind, settling the accounts of executors, administrators, curators and guardians and the sale or leasing of lands by administrators, curators and guardians; and also jurisdiction over all matters relating to apprentices: Provided, That until the General Assembly shall provide by law for a uniform system of probate courts, the jurisdiction of probate courts heretofore established shall remain as now provided by law.''

Said section 7 of the Laws of 1877 prescribes the number and times for holding the terms of the probate courts of the State. It reads as follows:

''Said courts shall hold four terms annually, commencing on the second Monday of February, May, August and November, and may hold special and adjourned terms at any time when required: Provided, however, That in all counties in which courts for the transaction of probate business are now held in more

than one place, then in such cases courts shall be held at the times and places now designated or provided by law. Said courts may alter the time for holding their stated terms, giving notice thereof in such manner as to them shall seem expedient.''

Said section 148, Revised Statutes 1879, provides for notice to be given to all persons interested in real estate when application is made to the probate court for an order to sell it to pay debts. It reads as follows:

''When such petition, and such accounts, lists and inventories, shall be filed, the court shall order that all persons interested in the estate be notified thereof, and that unless the contrary be shown, on the first day of the next term of the court, an order will be made for the sale of the whole, or so much of such real estate as will pay the debts of the deceased. Such notice shall be published for four weeks, in some newspaper in the county in which proceedings are had, or by ten hand-bills, to be put up at ten public places in said county, at least twenty days before the term of the court at which any such order will be made, in the discretion of the court.''

The case of Holliday v. Cooper, supra, holds, as stated in the syllabus, that: ''Where a writ is made returnable to no term known to the law of the land, but to some day not the commencement of a term, appearance and pleading will not cure the defect in the writ.''

The remaining authorities cited are of similar import to the last one considered.

Now as to the application of these authorities to the facts of this case. It will be remembered that at the June term, 1878, of the probate court of the city of St. Louis, the administrator filed his petition asking for an order of court to sell the lands of the estate to pay debts, and that during the same term, and on July 20, 1878, the court made the order of publication heretofore copied, notifying the interested

parties of said application for an order to sell the real estate to pay debts, etc.

This order for publication was duly published; and thereafter, at the September term, 1878, of the said court, and on the 26th day of October of that year, the order of sale was duly made and entered of record. Then follow the various other orders heretofore mentioned.

From this recitation of the facts it will be seen that the heirs of Lewis V. Bogy, according to this order of publication, were not ordered to appear at the February, May, August or November term of said court, to show cause why the lands should not be sold to pay debts, as provided for by said section 7 of page 230, Laws 1877, and section 148, Revised Statutes 1879, heretofore copied, but were, as previously stated, ordered to appear at the September term, 1878, thereof.

Upon that showing counsel for the appellants contend that under the authority of Holliday v. Cooper, supra, the heirs of Lewis V. Bogy were not legally required, nor were they under any legal obligation, to appear at the September term, 1878, or at any other time to show cause, etc., for the reason that the order of publication was void and of no force or effect and did not constitute a legal notice to them.

If that was all the law that we have bearing upon that question, then there would be no question but what the position taken by counsel for appellants would be sound and unanswerable; but unfortunately for them that is not all the law we have which is applicable to the case, as will presently appear.

Section 9, page 1601, Revised Statutes 1855, of "An Act Establishing a Probate Court in St. Louis County, and For Other Purposes," approved December 12, 1855, reads as follows: "Said court shall be held on the first Mondays of March, June, September, and December in each year; but it may alter the time

of holding its stated terms, giving notice thereof in such manner as the judge shall deem expedient; and it may hold adjourned terms.''

And it should be remembered that section 7 of Laws 1877, page 230, before copied, expressly provides that the probate courts of the various counties of the State ''may alter the time for holding their stated terms, giving notice thereof in such manner as to them shall seem expedient;'' and by consulting the statement of the case previously made, it will be seen that Judge WOERNER, at the June term, 1877, of the St. Louis county probate court, and on the 28th day of July, of that year, made and entered of record an order fixing the regular terms of said court to begin on the second Monday of September, and on the first Mondays of December, March and June of each year.

Since said order of publication was made returnable to the September term, 1878, of the probate court of St. Louis county; and since the court had fixed the second Monday in September as one of its regular annual terms, it would seem, in the absence of other controlling matters, that the order of publication returnable to the September term, 1877, would be sufficient notice to the heirs of Louis V. Bogy, to bring them into court at the said September term.

In opposition to that proposition, counsel for appellants insist that said order of the probate court of St. Louis county, made on July 28th, during the June term, 1878, thereof, fixing the second Monday in September and the first Mondays in December, March and June of each year, is void and of no effect for two reasons: first, because said order was made by the probate court of St. Louis county, and not by the probate court of the city of St. Louis, the terms of which, it is contended, the order purported to change, or in other words, the former court had no authority

by order, or otherwise, to change the terms of the latter court; and, second: because. "The laws of 1877 creating the probate court of the city of St. Louis, did not take effect until July 29, 1877 (ninety days after the adjournment of the 29th General Assembly of Missouri, on April 30, 1877); therefore the order made by the probate court of St. Louis county on July 28, 1877,. could not by any possibility have the effect to change the times as fixed by law for holding the terms of the probate court of St. Louis city, and did not authorize the probate court of St. Louis city to hold its terms of court at a date different from that fixed by law."

We will consider those two questions in the inverse order stated, for the reason that so far we have been dealing with the latter.

Conceding that the Act of 1877, did not go into effect until July 29, 1877 (which seems to be correct), one day prior to the date of the order of the probate court of St. Louis county fixing the stated terms thereof on the second Monday in September and the first Mondays in December, March and June of each year, nevertheless said section 9, page 1601, Revised Statutes 1855, was in full force and effect at the time the Act of 1877 became a law, which was, as before stated, July 29, one day subsequent to the date of the order so fixing the terms of the court. Not only was said order of July 28th fixing said terms valid when made, but it remained so during the entire period covering the administration of Lewis V. Bogy's estate. This is true because the Act of 1877 only purported to repeal (quoting), "all acts and parts of acts inconsistent with this act." [See section 20 of that act.]

Clearly there was nothing inconsistent between section 9 of the Act of 1855, and section 7 of the Act of 1877, both of which have been previously quoted. Each in express terms and almost in the same lan-

guage authorize the various probate courts of the State, by order, to change the stated terms thereof, to such times as the judges thereof may deem best and most convenient for the transaction of the business therein.

But independent of that, there is another sound rule of statutory construction which governs this case, and that is, a subsequent act of the Legislature repealing and reenacting, at the same time, a pre-existing statute, is but a continuation of the latter, and the law dates from the passage of the first statute and not the latter. [State ex rel. v. Mason, 153 Mo. 23, l. c. 58-59; State ex rel. v. County Court, 53 Mo. 128, l. c. 129-130; Smith v. People, 47 N. Y. 330.]

We therefore rule this contention against the appellants.

Attending the second contention of counsel before mentioned, namely, that the order of the probate court of St. Louis county, the court which appointed the administrator of the estate of Bogy, and which made the order of July 28, 1877, changing the terms of the probate court of the city of St. Louis, is void for the reason that one court cannot make a valid order changing the terms of another court.

As an abstract legal proposition, there can be no question but what this contention is sound and unanswerable; but the trouble with that rule is, it does not apply to the facts of this case. Counsel for appellants erroneously assume that the probate court of St. Louis county made an order changing the terms of another and different court, namely, the probate court of the city of St. Louis. In other words, counsel erroneously assume that the probate court of St. Louis county, which existed prior to the separation of the city of St. Louis in 1876 from the county of St. Louis, thereafter, under the law of the separation, became the probate court of the new St. Louis county, and that a new and different probate court was subsequently created by the Legislature for the city of St. Louis.

The fact is the separation of the city of St. Louis
in 1876 from the county of St. Louis did not affect the
organization, jurisdiction or location of the probate
court of the county of St. Louis, established in St.
Louis by an act of the Legislature in 1840 (Laws 1840,
p. 54), which is substantially the same as the Act of
1855 before mentioned.

This proposition is fully sustained by the follow-
ing authorities, viz.:  Secs. 20, 23 and 24 of article 4
of the Constitution; Sec. 34 of article 6, Constitution;
Section 5 of article 14, Constitution; Schedule, section
3, thereof; Section 1, page 1599, R. S. 1855; Scheme,
Sections 1, 3, 5 and 10; Henderson v. Koenig, 168 Mo.
356; Ex parte Buckner, 9 Mo. App. 540; State ex rel.
v. Finn, 4 Mo. App. 347; State ex rel. v. Mason, 4 Mo.
App. 377; State ex rel. v. Finn, 8 Mo. App. 341; State
ex rel. v. Walsh, 69 Mo. 408; State ex rel. v. Laughlin,
75 Mo. 147; Cunningham v. St. Louis, 96 Mo. 53; Bab-
cock v. Hahn, 175 Mo. 136.

Counsel for respondents, after a most exhaustive
review of the authorities, have carefully prepared a
brief upon this branch of the case wherein they have
ably considered the constitutional provisions author-
izing the separation of the city from the county of St.
Louis, the scheme and charter, under which the separ-
ation was effectuated, the acts of the Legislature en-
acted in furtherance thereto, as well as a review of the
decisions of this court and those of the St. Louis court
of Appeals construing them, delivered near the time
of their enactments, illuminated by the light of the po-
litical history of the times, in which that momentous
event occurred.

Because of the thorough consideration of the ques-
tion before mentioned and because of its important
bearing upon the case at bar, as well as upon the status
of, and the relation that exists between the city of
St. Louis and the county of St. Louis, I feel justified
in copying extracts therefrom (which are so much bet-

ter and more clearly expressed than I could hope to do) and adopt them as my views of the subject under consideration, which are as follows:

"1.  Section 1 of article 6 of the Constitution of 1875 vests all judicial power of the State in the various courts named, among which are probate courts.

"Section 34 of this article requires the General Assembly to establish in every county a probate court, which shall be a court of record and consist of one judge, who shall be elected, and vests jurisdiction in probate matters in such probate courts.  The section then ends with this proviso: 'Provided, that until the General Assembly shall provide by law for a uniform system of probate courts, the jurisdiction of probate courts heretofore established shall remain as now provided by law.'

"Section 35 of the same article provides that probate courts shall be uniform in their organization, jurisdiction, duties and practice, except that a separate clerk may be provided for or the judge may be required to act *ex-officio* as his own clerk.

"Section 5 of article 14 of the Constitution is as follows: 'In the absence of any contrary provision, all officers now or hereafter elected or appointed, subject to the right of resignation, shall hold office during their official terms and until their successors shall be duly elected or appointed and qualified.'

"Section 3 of the schedule provides as follows: 'All county and probate courts, as now constituted and organized, shall continue with their jurisdiction, until the General Assembly shall by law conform them in their organization to the requirements of this Constitution.'

"Section 6 of the schedule is as follows: 'All persons not filling any office or appointment in this State shall continue in the exercise of the duties thereof, according to their respective commissions or appointments, unless otherwise provided by law.'

"The Constitution of 1875 provided further for the enlargement of the boundaries of the city of St. Louis which was then a part of the county of St. Louis, and for a division of the county by the boundary line of the extended or enlarged city, thus making two political subdivisions of the old county of St. Louis, the one of which should be called the 'County of St. Louis,' and the other the 'City of St. Louis,' neither having any political relation to the other except that each was to be a copolitical subdivision or county of the State.

"These provisions are found in article 9, sections 20 and 25, inclusive.

"The method pointed out by section 20 for the accomplishment of this purpose was for the election on the call of the city council and county court of thirteen freeholders to draft a scheme for a division fixing the boundaries thereof, separating the enlarged city and county from each other. This scheme was also to provide for the reorganization of the government of the county and the adjustment of the relations between the enlarged city and the residue of St. Louis county, and the government of the city thus enlarged by a charter in harmony and subject to the Constitution and laws of Missouri, and provided that if the said scheme and charter were ratified by a vote of the people of the county they should become the organic law of the county and city, and such charter should become the organic law of the city at the end of sixty days after such election and should supersede the charter of St. Louis and all amendments thereof, and all special laws relating to St. Louis county inconsistent with such scheme.

"Section 21 provided for the authentication of the scheme and charter and that all courts should take judicial notice thereof.

"Section 22 provided for amendments of the charter.

"Section 23 provided, among other things, that the city should take upon itself the entire park tax and in consideration of the city becoming the proprietor of all the county buildings and property within its enlarged limits, it should assume the whole of the existing county debt, and that the city and county of St. Louis shall be independent of each other and that the city shall be exempt from all county taxes; that the judges of the county court shall be elected by the qualified voters outside the city; that the enlarged city shall be entitled to the same representation in the General Assembly, collect the State revenue and perform all other functions in relation to the State in the same manner as if it were a county as in this Constitution defined, and that the residue of the county shall remain a legal county of the State of Missouri, under the name 'County of St. Louis;' and the number of senators and representatives in the General Assembly of the enlarged city is fixed and also the number of senators and representatives for the new county.

"Section 24 is as follows: 'The county and city of St. Louis, as now existing, shall continue to constitute the Eighth Judicial Circuit, and the jurisdiction of all courts of record, except the county court, shall continue until otherwise provided by law':

"2.    The scheme for the separation of the county and city of St. Louis became, according to the constitutional provision, the instrument by which the two were separated and by which the reorganization of the county government was effected and became the organic law of the county and city. It went into effect October 22, 1876, having been adopted by vote of the people of the city and county as provided by the Constitution.

"Section 1 of the scheme defines the boundaries of the city and then provides as follows: 'And the

residue of what now constitutes the county of St. Louis shall hereafter be called St. Louis county.'

"By section 2 all the authority of the county officers, as they existed theretofore, was forever abrogated and annulled, except for the purposes and in the cases hereinafter provided.

"Section 3 provided for the election at the general November election of 1876 of the various county officers for the new county, and further provides as follows: 'Immediately succeeding the election in November, 1876, and when the result thereof is officially determined, as hereinafter provided, the justices of the county court shall meet at James C. Sutton's house on the Manchester road for the purpose of organizing the new government of the county. . . . Said court may determine at what place in said county said court shall meet and the county offices be located until the question of a permanent seat of justice may be determined. 'The section further appoints three commissioners to select a suitable place for a 'permanent seat of justice of said county' and to submit their selection to a vote of the people.

"Section 4 provides for the then present county court of St. Louis county transacting the business of the new county until the election of the officers at the November election.

"Section 5 provides for the calling of an election by the Mayor, to be held at the time the general election in November, 1876, is held, for the election of a sheriff and coroner and public administrator of the city of St. Louis.

"Section 7 provides that the clerk of the county court to be elected, as provided in section 3 of the scheme for the new county, shall be ex-officio recorder of deeds for said county and that the then present recorder of deeds for St. Louis county shall thereafter be known as the recorder of deeds and shall hold his office for his term as then prescribed by law, and

that at the November election, 1878, and every four years thereafter, the city recorder should be elected by the city.

"Section 8 declares that the office of president of the board of assessors shall be a city office and under the control of the city government, and that such books and plats of said office shall be divided and the president of the board shall deliver to the proper officer of the county such portions as exclusively refer to St. Louis county, and if this cannot be done, abstracts shall be made thereof. It provides that the county collector shall continue in office and shall pay to the city treasurer taxes collected within the city limits and to the county treasurer taxes collected in the county until the end of his term of office.

"The office of county auditor was abolished altogether. The assessment of property for taxes for the year 1877 was required to be made by the president of the board of assessors of the present county of St. Louis—which office was declared by this section thereafter to be a city office. It also provides that as soon as the assessor of St. Louis county shall be duly elected and qualified the president of the board of assessors shall deliver to said assessor the books, plats and all papers pertaining to the office of said county, and that it shall thereafter be the duty of the assessor of said county to assess the property of said county.

"Section 9 requires the county court of St. Louis county to see that all buildings, moneys and other property belonging to the county, which are placed under the control of the city under this scheme, shall be formally and properly transferred, and that said court shall cause all records, books, papers, etc., now in the office of said court, to be turned over to the city register. It further provides that all employees and officers, now in the service of the county, in connection with public institutions or otherwise, and under appointment of said county court and within the limits

of the city of St. Louis, as herein established, shall continue in the discharge of their duties until notified to the contrary by the mayor.

"Section 10 provides that all public buildings, institutions, parks and property of every character and description heretofore owned and controlled by the county of St. Louis within the limits as extended, including the courthouse, the county jail, etc., shall be transferred and made over to the city of St. Louis, and that in consideration of the city being the proprietor it shall assume the whole of the existing county debt and park debt. Section 11 requires the Municipal Assembly of the city to provide for payment of the said debt.

"The following sections of the scheme, down to and including the last, provide for the adjustment of the affairs of the city and county in keeping with the provisions heretofore referred to.

"3. The next act of the Legislature which need be noticed is the Act of April 9, 1877, Laws 1877, p. 229.

"For the first time the Legislature by this act provided a probate court for every county in the State, theretofore probate business having been transacted in some of the counties by the county courts, though there were probate courts established in some of the counties prior to this.

"Section 1 of this act provides that a probate court, which shall be a court of record and consist of one judge, is hereby established in the city of St. Louis and in every county of this State.

"Section 2 grants jurisdiction to the probate courts in probate matters.

"Section 3 provides that at the general election in the year 1878, and every four years thereafter (except as hereinafter provided) a judge of probate shall be elected by the qualified voters of every county.

"Section 7 provides that said court shall hold four terms annually commencing on the second Monday of February, May, August and November, and may hold special and adjourned terms at any time; and it also provides that said courts may alter the time for holding their stated terms, giving notice thereof in such manner as to them shall seem expedient.

"Section 12 provides that the judge of probate shall hold his office at the county seat of his county and in the city of St. Louis.

"Section 18 provides, among other things, as follows: 'All probate and ex-officio probate judges now in office shall continue in office and discharge all the duties of judges of probate under this act until the expiration of the terms for which they were respectively elected.'

"This section contains a proviso 'that in all counties where the county courts or any member thereof has, by the present existing law, probate jurisdiction, there shall be a judge of probate elected for such counties at the general election in the year 1878, and every four years thereafter.'

"Section 19 provides that "all cases pending in probate courts at the time this act takes effect, the jurisdiction of which is not conferred by this act, shall be certified to courts of competent jurisdiction.'

"Until the Act of April 9, 1877, the several county courts in counties where there was no probate court had exclusive original jurisdiction in all probate matters. [1 Wagner's Stats. (1870), p. 440, sec. 7.]

"In 1879 the Legislature of the State enacted a Statute of Definitions, the nineteenth paragraph of which reads as follows:

"'Nineteenth. Whenever the word "county" is used in any law, general in its character to the whole State, the same shall be construed to include the city of St. Louis, unless such construction be inconsistent

with the evident intent of such law or of some law especially applicable to such city.' [1 R. S. 1879, sec. 3126, par. 19.]

"This section was carried into 2 R. S. 1889, sec. 6570, par. 19, and in 1 R. S. 1899, sec. 4160, par. 19, and in 2 R. S. 1909, sec. 8057, par. 19.

"This section has been twice amended since 1879, but paragraph 19th has always been the same since its first enactment. [Laws 1883, p. 111; Laws 1885, p. 190.]

"The effect of the scheme was to divide the old county of St. Louis into two counties, one under the name of the city of St. Louis containing the old county seat and all the courts, offices and public buildings and was the old county less the portion cut off and named the county of St. Louis, which was under the necessity of creating a county seat for itself where would be located the county offices to which it became entitled by reason of becoming a county.

"That this was the effect of the separation of the city and county is attested by numerous decisions, many of them rendered about the time of the separation, some of which are here cited: State ex rel. v. Sutton, 3 Mo. App. 388; State ex rel. v. Finn, 4 Mo. App. 347; State ex rel. v. Mason, 4 Mo. App. 377; State ex rel. v. Finn, 8 Mo. App. 341; State ex rel. v. Walsh, 69 Mo. 408; State ex rel. v. Laughlin, 75 Mo. 147; Ex parte Buckner, 9 Mo. App. 540; Cunningham v. St. Louis, 96 Mo. 53.

"The seat of justice of the county of St. Louis, prior to 1876, was the city of St. Louis. The courthouse of the county of St. Louis was located in the city of St. Louis by the act of December 14, 1822, and two years afterwards was built.

"The seat of justice of a county and the county seat mean the same thing. The county seat is the town

241 Mo.—47

in which the county and other courts are held and where county officers perform their function.

"The city of St. Louis has been, since the separation from the county in 1876, for all necessary purposes, a county in itself. [Babcock v. Hahn, 175 Mo. 136.]

"The Supreme Court, in Banc, by unanimous opinion, used the following language respecting the status or character of the city of St. Louis in the case of State ex rel. v. Bus, 135 Mo. 325, l. c. 337:

" 'While the city of St. Louis is strictly a municipal corporation, its territory is also a subdivison of the State in which officers are elected to perform the functions of the State government as distinguished from those pertaining to municipal government. These officers are in no sense municipal officers. Their designation as officers of the city of St. Louis refers to their territorial jurisdiction rather than to the governmental duties they perform. They are officers under the laws of the State and perform their duties within the city limits. The sheriff of the city of St. Louis is an officer of the city in the same sense that a sheriff of a county is an officer of the county. He is no more a municipal officer than a sheriff of a county is an officer of a municipal corporation, the territory of which is included in his jurisdiction. These propositions are settled by the decisons of this court. [State ex rel. v. Dillon, 87 Mo. 490, 491; State ex rel. v. McKee, 69 Mo. 504; State ex rel. v. Rombauer, 101 Mo. 502, and also State ex rel. v. Mason, 4 Mo. App. 380; State ex rel. v. Finn, 8 Mo. App. 341.] '

"The Supreme Court, in Banc, further said, in the case of State ex rel. v. Railroad, 195 Mo. 228, l. c. 241: " 'The city of St. Louis is a political subdivision of the State as much as any county in the State, and is treated as a county.'

"The division of the old county of St. Louis took effect October 22, 1876, and thereafter each part, for

court and other State purposes, formed a separate county.

"The Act of April 9, 1877, providing for probate courts in the city of St. Louis and in every county in the State, was enacted in pursuance of sections 34 and 35 of article 6 of the Constitution, and of necessity treated the city of St. Louis as one of the counties of the State, and it is a county in so far as the probate court is concerned and the office of probate judge in the city of St. Louis is a county office. [Henderson v. Koenig, 168 Mo. 356, 362, 363, 368, 374.]

"After the separation of the city and county of St. Louis the probate court of the old county of St. Louis remained the same court that it had been since 1841 with its name changed to the probate court of the city of St. Louis, and with its territorial jurisdiction curtailed as soon as a new probate court for the new county of St. Louis was created by the Act of 1877.

"4.  The effect of the scheme was that the old probate court of the old county of St. Louis continued to exist as the probate court of the city of St. Louis upon the city's separation from the county, and a new probate court was created for the new county of St. Louis.

"The seat of government of the old county of St. Louis was in the city of St. Louis, where was located the courthouse and all the county offices, and they remained there after the separation of the city and county except those offices which were abolished.

"The legal effect of the separation of the city and county was a division of the old county of St. Louis into two counties, the one, namely, the city of St. Louis, having within its borders the seat of government; while it may not have continued to be the identical entity as the old county, and while the form of its government thereafter was different from what it was before, it was at least the continuation of and successor to, for legal purposes, the old county, and

its government the successor, in so far as the same functions were provided to be performed, of the old government; the courts, except the county court, which was expressly abolished, remained the same and re- tained the same habitation and jurisdiction.

"This is true both as matter of political history of the times, attested by the knowledge of all who are familiar with these times, and also as a matter of law, as is clearly shown by reference to the Constitu- tion of the State, the acts of the Legislature, the scheme of separation of the city and county of St. Louis, and the decisions of the courts, and the evidence in this case showing that the records of the probate court, which existed prior to the Act of 1877, are in the courthouse in the city of St. Louis.

"Section 34 of article 6 of the Constitution pro- vides that, 'the General Assembly shall establish in every county a probate court,' etc., and further pro- vides 'that until the General Assembly shall provide by law for a uniform system of probate courts, the jurisdiction of probate courts heretofore established shall remain as now provided by law.'

"The term 'jurisdiction' as here used involves both territorial as well as juridical scope and juris- diction. [State ex rel. v. Laughlin, 75 Mo. 1. c. 155.]

"The probate court of St. Louis county continued, therefore, to exercise the same territorial jurisdiction until the passing of the Uniform Probate Court Act of 1877 (Laws 1877, p. 229). It also exercised the same judicial functions within this identical territory. Its name even was unchanged by any legislative or actual designation.

"Up to the time of the taking effect, therefore, of the Act of 1877, by every conceivable test, the original probate court of the county of St. Louis retained its original constitution. Furthermore, it is a well-known fact of local history that it preserved even its local

habitation in the city of St. Louis and the personality of judge and other officers.

"It ought to be reasonably plain, therefore, that the adoption of the scheme and charter did not, and could not, of itself put an end to the court's existence.

"But this it not all.  By section 24 of article 9 of the Constitution it is expressly provided that 'the jurisdiction of all courts of record, except the county courts, shall continue until otherwise provided by law.'

"The probate court of St. Louis county was a court of record, having a territorial jurisdiction that embraced both city and county.  It therefore continued to exist as the same court in spite of the separation of city and county.

"Not content with these plain indications of their intention, the framers of the Constitution superadded, in the schedule of the Constitution, a plain and unequivocal statement of their intention, reading as follows: 'Section 3.  All county and probate courts, as now constituted and organized, shall continue with their jurisdiction, until the General Assembly shall by law conform them in their organization to the requirements of this Constitution.'

"This was a probate court.  Under this plain language, its constitution, organization and jurisdiction remained at the very least until the taking effect of the act of the Assembly, which was not to create but to conform existing probate courts to the requirements of uniformity prescribed by the Constitution.  Its seat remained in the city of St. Louis; its jurisdiction remained.

"5.  The eighteenth section of the Act of April 9, 1877, continued in office judges of probate who were then holding office, until the expiration of the term for which they had been elected, and consequently continued the office, for an officer cannot be continued in an office that does not exist, and the office being that

of judge of the probate court, the court was continued or remained in existence as it was at the time of the passage of that act.

"It was so expressly held with respect to the probate court of Lafayette county, in the case of State ex rel. v. Gammon, 73 Mo. 421, decided at the April term, 1881, where the Supreme Court also held that giving that effect to the Act of 1877 did not bring it in conflict with section 34 of article 6 and section 35 of article 6 of the Constitution.

"What, then, was the effect of the Statute of 1877?

"Before considering its terms, it may be stated that J. G. Woerner was elected judge of the probate court of the county of St. Louis at the general election held in the year 1876. [See sec. 4 of the Act of 1885.] He continued to hold his seat and perform the functions of a judge of that court past the sale here in controversy without any new election or fresh appointment. Thousands of matters were presented to and acted upon by the court, and by the judge thereof, during its terms. To disturb these matters would be to disquiet the titles of an incalculable amount of property in this city and in this State.

"It is further a well-known historical fact that the first judge of the probate court in the segregated portion of the county was James A. Henderson, who was appointed and commissioned as such by Governor Phelps under the Act of April 9, 1877, on the 2d day of August, 1877. The first place of meeting of this court was at Mt. Olive, the temporary seat of justice in that subdivision of the county before any permanent county seat had been selected. No appointment of judge for the city of St. Louis was made under that act for the reason that that office already had an incumbent in the person of Judge WOERNER.

"It is further a well-known and historical fact that no cases were transferred from the old court in

the city of St. Louis to the new one in the county.

"The records of the old court remained and were kept in the courthouse in the city of St. Louis, in the charge and under the control of the same judge and officers who had theretofore been vested with their custody. The seat of the old court had been fixed by the Law of 1841, as being the courthouse of the county of St. Louis in the city of St. Louis, where the probate court still holds its sessions. After the taking effect of the statute of 1877 the court that had existed remained in its old quarters. It retained there its records, its unfinished causes, its judge and its clerk. There was no interruption in the orderly course of its business.

"There existed no probate court for the segregated portion of the county until August, 1877. Then a new judge was appointed for it, a seal adopted, temporary quarters secured, and rules were framed for its government. It succeeded to no unfinished business, but took up such causes as subsequent death or other casualty within the territorial limits of its jurisdiction brought before it.

"All of these facts constitute familiar local and political history, and as such are within the fair limits of the judicial cognizance of this court.

"Under this state of facts, it is manifest that practical and contemporaneous construction regarded the court, existing in the city of St. Louis after the taking effect of the Statute of 1877, as a mere continuation of the old court.

"The weight to be given to contemporaneous construction in matters of this kind, after many years of acquiescense, is so strong that no court will disturb the composed slumber of things that were done in reliance thereon unless the legal necessity therefor be plain and apparent.

"No such legal necessity is apparent here; the converse is true.

"Section 18 of the Act of 1877 provides as follows:

" 'Sec. 18. All probate and ex-officio probate judges, now in office, shall continue in office and discharge all the duties of judges of probate under this act until the expiration of the terms for which they were respectively elected, and shall receive in full satisfaction for their services, until the expiration of the time for which they were elected, the compensation now provided by law, anything in this act to the contrary notwithstanding, except such ex-officio probate judges as have jurisdiction over a part only of the county, in which case they shall receive the same compensation that they receive while sitting as judges of the county court, and no more; *provided,* that in all counties where the county courts, or any member thereof, had by the present existing law probate jurisdiction, there shall be a judge of probate elected for such counties at the general election in the year 1878 and every four years thereafter.'

"Fresh duties could of course be imposed upon an existing and continuing officer. But if a court were wiped out and abolished there could no longer be any such officer as a judge of that court. If, on the other hand, the statute be regarded as conforming to a general plan, an existing court, its identity as a political organism with that of its officers, remains; and upon them as existing and continuing courts and officers, duties could be validly superadded or taken away.

"It is an established canon of construction, familiar to this court, that such an interpretation must be given to a law, if possible, as will render it valid rather than invalid, that it may live rather than perish. For this reason, the interpretation favoring continuance of existing courts should be adopted.

"In the next place, back of every statute stands the Constitution, and the statute must be interpreted in substantial harmony with the expressed will of the

Constitution.  For the purpose perhaps of rousing as little opposition as possible to the changes of the new Constitution or with a view perhaps of avoiding too sudden changes, that instrument is remarkably full in its express intent to interfere as little as possible with the terms of judicial officers in existing courts.

"Now there is absolutely nothing in the statute of 1877 that is contrary to the continued existence as a court of the old probate court of the county of St. Louis, located in the city of St. Louis, and its location was not changed. The general framework of the law of 1877 is little different from that of the law of 1855, creating the old probate court of the old county of St. Louis.  Most of the changes may be accounted for by a reference to the 19th section of the Law of 1877: 'All cases pending in probate courts at the time this act takes effect, the jurisdiction of which is not conferred by this act, shall be certified to courts of competent jurisdiction.' The plain implication is that the other cases were to be retained.

"The Act of 1877 does not undertake to repeal the law of 1855 creating the probate court of the county of St. Louis, but simply provides merely that all acts and parts of acts inconsistent with the Act of 1877 should stand repealed."

In the light of these observations it must follow, that it was not the design of the Act of 1877, or of any subsequent act, to abolish any probate court then existing in any of the counties of the State, but in express terms it continued their existence, and in obedience to the express mandate of section 34 of article 6 of the Constitution, created new probate courts in all of the counties of the State, which at that time had none, probably ninety-five in number, St. Louis county being one of the number.

We, therefore, also rule the second contention against the appellants.

II.  The final insistence of counsel for appellants is stated in the following language, viz.:

"The first sale of the lands in controversy by the administrator having been disapproved by the probate court, the order to sell could have been renewed by the probate court at the same term at which the same was disapproved while the heirs were presumed by law to be present in court, but as this was not done, and as the heirs of Bogy did not appear in court and did not ratify the proceedings in any manner, the renewed order of sale, upon which respondents' claim is based, made nearly a year after the sale was disapproved, was void for want of jurisdiction.

This insistence is predicated upon section 168, Revised Statutes 1879, which reads as follows: "If such report and proceeding of the executor or administrator be not approved by the court, his proceedings shall be void, and the court may order a new sale, upon which the same proceedings shall be had as upon the original order."

If we correctly understand the position of counsel, it is this: That when the order of the court disapproving the first sale was made, and the term elapsed without ordering a new sale, the court lost jurisdiction over the heirs of Lewis V. Bogy, and was therefore powerless to make the second or subsequent order of sale without again notifying them of the renewed application for an order to make the second sale.

In support of this position counsel cite: George v. Middough, 62 Mo. l. c. 551; State ex rel. v. Walbridge, 119 Mo. l. c. 394; Koch v. Hawkins, 40 Mo. App. 680; Ault v. Bradley, 191 Mo. l. c. 729.

We have carefully considered all of those cases and are satisfied that the rule there announced is not applicable to the facts of this case.

In those cases a final judgment had been rendered, from which an appeal would have lain, and at a subsequent term, without notice to the parties, the court

attempted to change or modify the judgment. This court and the Court of Appeals very properly held that such alteration was void for want of jurisdiction over the opposite parties. But that is not this case. Here the heirs of Bogy were duly brought into court to show cause, if any, they had, why the land should not be sold to pay the indebtedness of the estate. They made no such showing, and consequently the court in pursuance to its finding, that the estate was hopelessly insolvent, ordered the land sold to pay debts; but owing to the inadequacy of the price, the court set the sale aside. That left the proceedings for an order of sale still pending, the same as a cause in the circuit court, where after judgment a motion for a new trial has been sustained or the court, of its own motion, during the term, has set the judgment aside. In both instances all the parties to the cause remain in court until a final disposition of the case is made one way or the other.

It is elementary that whenever a party is duly summoned into court for a particular purpose he remains there until that purpose is finally accomplished or disposed of, or until he is otherwise discharged according to law.

That precise question was decided by this court in the case of State ex rel. v. Wilson, 216 Mo. 215, l. c. 282; and it only announced the doctrine which had been frequently announced by this court in previous cases, and which has been followed by us in a number of cases since then.

Coming nearer to the precise question here presented, are the following cases: Rhodes v. Bell, 230 Mo. 138; Rogers v. Johnson, 125 Mo. l. c. 214; Sims v. Gray, 66 Mo. l. c. 616; Stowe v. Banks, 123 Mo. 672; Greffet v. Willman, 114 Mo. 106; Collier v. Lead Co., 208 Mo. 246.

In the Rhodes-Bell case, supra, at page 159 the court used this language: "It is next insisted that

the renewal order of sale made on March 27, 1877, under which the lands in suit were sold, is void, because the probate court changed the terms of sale from a private to a public sale, without notice to the heirs of Liggitt. Administrators' sales under orders of the probate court are judicial sales, and in Tutt v. Zenir, 51 Mo. 431, this court held that it was perfectly competent for the county court to modify an order of sale made by itself so as to authorize property which had been ordered to be sold at public sale to be sold at a private sale, and that decision has never been questioned or criticised in any subsequent case in this court. Judicial sales in contemplation of law are made by the court itself through its receiver or administrator and we can discover no reason why the court may not in proper case modify or change its order. [Noland v. Barrett, 122 Mo. l. c. 189.]''

In Sims v. Gray, supra, the court on page 616 said: ''It may be proper to remark that if the defendant had introduced the administrator's deed, the judgment might be upheld, notwithstanding the fact that the sale was reported and approved at the same term at which it was made. When the petition for the sale of the real estate was filed and publication was made, notifying all persons interested in the estate that, on a day named, an order for the sale thereof would be made, unless cause to the contrary should be shown, the heirs were in court; and no other or further notice was required, by law, to be given to them of any subsequent proceedings in the cause. The court was a court of record, having complete jurisdiction of the subject-matter of the proceeding, and while such jurisdiction must be exercised according to law, yet if the court exceeds its powers under the law, and disregards the statutory requirements established for its guidance, its acts may be irregular or erroneous, but they will not be void. [Johnson v. Beazley, 65 Mo. 250.] A judgment rendered after notice, but sooner

than it should have been rendered according to the rules of law, or the practice of the court, is simply an irregular judgment, and may be set aside on motion, in any court of record, at a subsequent term. [2 Wag. Stat. (1870), 1062, section 26; Branstetter v. Rives, 34 Mo. 318; Lawther v. Agee, 34 Mo. 372; Harkness v. Austin, 36 Mo. 47.] This remedy seems to have been overlooked in the cases of the State to the use of Perry v. Towl, 48 Mo. 148, and Castleman v. Relfe, 50 Mo. 583, where it was clearly applicable, and also in the cases of Strouse v. Drennan, 41 Mo. 289, and Mitchell v. Bliss, 47 Mo. 353. The judgment of the circuit court will be reversed and the cause remanded.''

In Stowe v. Banks, supra, the court held that where, after an order to show cause why the real estate should not be sold to pay debts, it was sold by the administrators and afterwards repurchased by them for the use of the estate, a second order to show cause was not necessary.

And in Greffet v. Willman, supra, the court on page 119 said: ''That Louis E. Roy died seized in fee simple of three-fourths of the land in question, there is no doubt. The only doubt as to plaintiff's wife having acquired his title thereto is in the suggestion aforesaid of defendant's attorneys, that the administrator, under the order of the probate court, had no power to make a resale upon the failure of Strong to comply with the term of the sale. This doubt seems to have arisen from the want of a proper appreciation of the force of the whole record of the probate court in the matter. There never was in fact a consummated sale of the property to Strong which could be confirmed, and no such sale thereof was reported to the court. What the administrator reported to the court was that he had offered the property for sale in pursuance of the order of sale, that Strong was the highest bidder at the sum of $21.75 and the prop-

erty had been knocked off to him, and that he was willing to comply with the terms of sale, provided it would meet with the approval of the court. Thereupon the order of the tenth of August, 1874, was made, which is relied upon to give color to this objection to the title. The terms of the order do not appear in the record; but whatever the form of the order may have been when the administrator made his report, no sale to Strong had been made. He reported that none had been consummated, and what he had done in that direction, and the willingness of Strong to complete the sale upon the approval of the court. The most the court could do in its then condition was to signify its approval of the proceedings of the administrator so far as he had gone and give assurance of a confirmation of the sale when the terms thereof should be complied with. The jurisdiction of the probate court to execute its own judgment for the sale of the property could not be lost until a sale had actually been consummated under its order, and, after this order was made, Strong, having failed and refused to comply with the terms thereof, in other words, refused to take the property at his bid and either pay or secure the purchase money, there can be no doubt of the power of the court to enforce its judgment for the sale of the property for the payment of the debts of the deceased by ordering a sale at any subsequent term until a sale was effected; or that the purchaser at such sale would acquire the title of the intestate. [2 Woerner's American Law of Administration, p. 1064.]''

I can add nothing new to what this court has clearly said upon this question, and if we apply the rule announced in the foregoing cases, to the case at bar, it will result in holding that the order of sale and the sale of the land in controversy, by the administrator, Holliday, made at the next or succeeding term of the court, was invalid, and that the administrator's

deed made in ·pursuance thereof was effectual to con-
vey a good title thereof to the purchasers.

And upon the other hand, we must hold that the
quitclaim deeds from Joseph Bogy and Josephine
Noonan, heirs of Lewis V. Bogy, dated September 18,
1895, conveying the lands in controversy to J. W. Chil-
ton, and the quitclaim deed from said Chilton to John
C. Brown, his co-appellant, conveying one undivided
half interest in the same land to the latter, are abso-
lutely null and void, and are of no force or effect, ex-
cept to cast a cloud upon the title of the respond-
ents.

We are, therefore, of the opinion that the judg-
ment should be affirmed, and it is · so ordered.    All
concur.